Filed 2/20/18; On rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| AREA 51 PRODUCTIONS, INC., <br><br>  Plaintiff and Respondent, <br><br> v. <br><br> CITY OF ALAMEDA et al., <br><br>  Defendants and Appellants. | A144645 <br><br> (Alameda County <br> Super. Ct. No. RG-14-741702) |

Area 51 Productions, Inc. (Area 51), an event planning company, had a long-standing relationship with the City of Alameda (the City) to license the use of certain City property to Area 51 for events Area 51 helped plan and promote with third-party companies. The City relied on PM Realty Group, L.P. (PM) to assist it with managing these license arrangements. Due to various problems at or in connection with events put on by Area 51, the City decided to cease doing business with it in mid-2014.

Because that left Area 51 on the hook to a number of third-party entities based on commitments undertaken in reliance on PM's previous confirmation of the City's willingness to license event space, Area 51 sued the City and various other parties who acted on the City's behalf, seeking damages. Sued along with the City were City Manager John Russo and Acting Assistant Community Development Director Nanette Banks Mocanu, as well as PM and three employees of PM, Stacey McCarthy, Tiffany McClendon and Maria Elgarico.[1]

---

[1] Unless otherwise indicated, we will refer to all appellants collectively as the "Defendants," to Russo and Mocanu as the "Individual City Defendants," and to PM, McCarthy, McClendon and Elgarico as the "PM Defendants."

In response to the complaint, Defendants filed a general demurrer and a motion to strike all causes of action under Code of Civil Procedure[2] section 425.16, commonly known as the anti-SLAPP statute. Following the trial court's simultaneous denial of that motion and grant of the demurrer, Defendants appealed the adverse order on their anti-SLAPP motion, arguing that all of Area 51's claims arise from protected activity and are without merit. We shall reverse in part and affirm in part.[3]

## I.    BACKGROUND

### A.    Factual History

Together with the facts alleged in the complaint, the declarations submitted in support of and against the anti-SLAPP motion reveal, in substance, the following circumstances. The City has leased a substantial amount of land from the federal government since at least 2000, including, as relevant here, the former Alameda Naval Air Station, also known as Alameda Point. According to the City, it "licenses specific areas of Alameda Point for private use, including an area known as the Northwest Territories (the 'NWT') located on the former Naval Air Station runway." The City established an elaborate licensing process for anyone who wants to use its property, and as part of that process has contracted with PM since 2004 to "manage[] the leasing and licensing of Alameda Point."

For over a decade, the City has licensed the NWT and other property to Area 51, an event promotion company, for various events the company has helped plan and promote on behalf of third-party companies. Apparently, however, this long-standing relationship has been periodically fraught with disputes surrounding Area 51's compliance with the City's rules. For instance, the two parties have sometimes disagreed on whether Area 51 properly disclosed its intended activities in some licensing applications; and sometimes other tenants have complained about Area 51's disturbances. Given these issues, around late 2013 the City encouraged Area 51 to work with Rock

_____

[2] All undesignated statutory references are to the Code of Civil Procedure.

[3] Both parties also make requests for attorney fees, which we will discuss below.

2

Wall, another of the City's tenants, but one with whom it has had few if any compliance issues. Thus, in September 2013 Area 51 and Rock Wall formed a new entity, Area 51 Enterprises, LLC (Enterprises). On September 23, 2013, Enterprises entered into a one-year standing licensing agreement with the City starting October 1, 2013. The agreement provided (1) it was "fully revocable at the sole option and discretion of" the City, and (2) prohibited transfers to anyone but Enterprises and the City.

Only a few days later, on October 4, 2013, Rock Wall severed ties with Area 51 and withdrew from Enterprises. It seems no one informed the City of this development until January 2014, at which point PM notified Area 51 that "the current license agreement in place is no longer valid since the company has made legal changes with their stakeholders and the agreement is between the City and both companies." Before and after finding out about Rock Wall's withdrawal from Enterprises, the City placed "soft holds" on the NWT property upon Area 51's request, for various events from May to December 2014. In February 2014, the City reminded Area 51 by email that it would need to obtain new license agreements; otherwise, it would "be unable to utilize the Northwest Territories for the events held on the calendar." It is unclear whether Area 51 received, acknowledged, or responded to these emails.

On March 10, 2014, Area 51 emailed PM to confirm the holds for its events later that year. The next day Elgarico replied for PM on behalf of the City, confirming the "soft holds" for the specified dates. The City then emailed Area 51 in late March to reiterate it needed to memorialize "licenses for those scheduled events," and PM emailed Area 51 in April with a draft license agreement for its May event and clarified that PM would "do a new [l]icense agreement for each of [Area 51's] events." According to Area 51, this email exchange essentially serves as the communicated offer and acceptance of terms, producing a firm contractual commitment to license the NWT properties to Area 51 on the "soft hold" dates.

Defendants allegedly breached this "agreement" in May, as evidenced by a May 19, 2014 email from Mocanu to Area 51, stating "I have spoken to the City Manager" and

3

"the City's licensing relationship with Area 51 is over." Nevertheless, the event in May took place as scheduled without a new license agreement, but gave rise to some compliance disputes which ultimately triggered the City's termination of the relationship on May 19. In her May 19 email to Area 51, Mocanu pointed to these compliance issues as an example of why the City had wanted Area 51 to work "under Rock Wall."

### B. Procedural History

Area 51 filed a notice of claim with the City, requesting use of the property on the dates requested or damages. The City denied this request, prompting Area 51 to file its complaint, naming as defendants the City, the Individual City Defendants, and the PM Defendants, and asserting six causes of action against all of them. In the complaint, Area 51 alleged on information and belief that each Defendant was an "agent, employee or representative of each of the . . . [other] Defendants and in doing the things mentioned herein, was acting in the course and scope of such agency and employment." Attached to the complaint were numerous documentary exhibits detailing many of the facts summarized above.

Area 51's six causes of action were: (1) breach of contract and breach of the implied covenant of good faith and fair dealing, based on its belief that Defendants had entered into a contract with Area 51 by virtue of confirming the holds on its events "on or about March 11, 2014"; (2) tortious interference with Area 51's third-party contracts; (3) intentional interference with prospective economic relations; (4) negligent interference with prospective economic relations; (5) unfair competition under Business and Professions Code section 17200; and (6) negligent misrepresentation, as to the "important fact . . . that their confirmed reservations of the [NWT] Property would be honored."

The City and the Individual City Defendants timely moved to strike all six causes of action under the anti-SLAPP statute, and the PM Defendants joined the motion. Area 51 opposed it, submitting the declaration of its Chief Executive Officer, John Walker, as the sole evidentiary showing in support of its claims. Without attaching and

4

authenticating any of the various documents supplied as exhibits to the complaint, Walker's declaration reads, in its entirety, as follows:

"1. I am the CEO of Area Productions, Inc., d/b/a Area 51 Enterprises, LLC, the Plaintiff if [*sic*] the above-captioned action.

"2. In March of 2014 of 2014 [*sic*] the City and PM Realty, through its [*sic*] agents and employees[,] confirmed and agreed on dates for four events. Two events, one for Volkswagen and one for BMW, occurred before the natural termination of a Long Term Agreement for leasing space with the City that was set to expire in September, 2014. The remaining events, for Bridgestone and Porsche, were set to occur on October 7–12, 2014 and November 4–10 2014, respectively. PM Realty knew that the Property must be unconditionally available before I could secure Third Party Agreements and attendance insurance, as was customary in our dealings for the prior two decades.

"3. Area 51 Enterprises was formerly business partners with Rock Wall Wine, Inc.

"4. When Area 51 Enterprises partnered with Rock Wall Wine, Inc., it introduced Rock Wall to the Property it had used to hold its events for the prior 18 years.

"5. Up until September 2014 Area 51 and the City had a Long Term License Agreement that covered all of its individual events.

"6. After September 2014 Area 51 confirmed its individual events with PM Realty before entering into Third Party Agreements.

"7. Contrary to Defendants' assertion that it either (a) was 'void 4 days after its execution' or (b) 'in January 2014' when Defendant[s] allegedly became aware of potential grounds to void the Agreement, I never received any indication that the City or PM Realty prevent [*sic*] Area 51 from use of the Property.

"8. In fact, up until May of, 2014, the City, PM Realty and the Individual Defendants continued to accept security deposits from Area 51 and never indicated that Area 51 should not enter into Third Party Agreements, after confirming their space, as they had in the 18 years prior.

5

"9. Although the City and PM Realty have offered a number of excuses for failure to provide the Property as required, among them: (1) heavy trucks . . . (2) change in proportional shares of Area 51 and (3) licensing issues, the Defendants have neglected their obligations due to a personal issues [*sic*] the Defendants have with me, unrelated to business or any agreements we have entered.

"10. Upon information and belief, the City, PM Realty, [and the] Individual Defendants conspired to force Area 51 out of the lease space and secure a more lucrative deal with Area 51's former partner, Rock Wall.

"11. Due to the acts and omissions set forth in my Complaint, Area 51 has been sued by one of the Third Parties addressed in the Complaint. *See Octagon Inc. v. Area 51 Enterprises* (BC 539128) seeking $121,650.00 for 'failing to provide the Premises or services as promised.'

"12. It was Defendants' non-performance that occasioned Area 51's inability to provide the Property for purposes of the BMW Event.

"13. The City an [*sic*] PM Realty continue to do business with Rockwall [*sic*], despite its claims that Rock Wall's transfer of ownership shares resulted in some prejudice to them that allowed breach of the subject agreements."

The trial court denied Defendants' anti-SLAPP motion without addressing whether Area 51 showed a probability of success on any of its claims. The court concluded the conduct underlying all of Area 51's claims is not protected activity within the meaning of the statute. (See § 425.16, subds. (b)(1), & (e)(2) & (4).)[4] For this conclusion, it cited three cases relied upon by Area 51 (see *Kajima Engineering & Const., Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 930–931 (*Kajima*); *Blackburn v. Brady* (2004) 116 Cal.App.4th 670, 676–677 (*Blackburn*); *Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790, 808–809 (*Wang*)), and

[4] Defendants filed an extensive set of evidentiary objections to the Walker Declaration. After denying the anti-SLAPP motion on grounds Area 51's complaint is not based on protected conduct, the court overruled Defendants' evidentiary objections, concluding they were "moot." Defendants have not challenged that ruling on this appeal.

6

distinguished one relied on by Defendants (see *City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358 (*City of Costa Mesa*)).

Along with their anti-SLAPP motion, the City and the Individual City Defendants also filed a demurrer as to all claims, which the PM Defendants joined. The court sustained the demurrer with leave to amend. Defendants appealed the denial of their anti-SLAPP motion (see §§ 425.16, subd. (i) & 904.1, subd. (a)), one day after Area 51 filed its motion for attorney fees under the statute (see § 425.16, subd. (c)(1)).

## II.    DISCUSSION

### A.    The Anti-SLAPP Statutory Scheme and the Standard of Review

A SLAPP suit—a strategic lawsuit against public participation—seeks to chill rights to free speech or petition by dragging the speaker or petitioner through the litigation process, without genuine expectation of success in the suit. The Legislature enacted section 425.16 to provide a summary disposition procedure for SLAPP claims. Toward this end, section 425.16 authorizes courts, upon motion by anyone who claims to be the target of a SLAPP suit, to probe the basis for any cause of action allegedly arising from protected communicative activities, and to strike it if the claimant cannot show minimal merit. "[T]he statutory remedy afforded by section 425.16 extends to statements and writings of governmental entities and public officials on matters of public interest . . . that would fall within the scope of the statute if such statements were made by a private individual or entity." (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 17.)[5]

---

[5] See also *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, 353 (*San Ramon*) ("We have no doubt that a public official or government body, just like any private litigant, may make [a special motion to strike] where appropriate"); *City of Costa Mesa*, *supra,* 214 Cal.App.4th at pages 371, 384 (striking claims against city employees based on statements employees made to members of public concerning possibility of obtaining licenses at plaintiff's property); *Levy v. City of Santa Monica* (2004) 114 Cal.App.4th 1252, 1258–1259 (striking complaint against city and city council member based on council member's statements made to planning department about a citizen's building permit); *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1116 (striking

7

The heart of the anti-SLAPP statute is section 425.16, subdivision (b)(1), which provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Section 425.16, subdivision (b)(1) does not provide a form of immunity, "insulat[ing] defendants from *any* liability for claims arising from the protected rights of petition or speech." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) Rather, the statute "only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Ibid.*)[6]

Courts analyze anti-SLAPP motions using a familiar two-step analysis. In step one, " ' "the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity." ' " (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321 (*Barry*).) Although the anti-SLAPP statute does not actually use the term "protected activity," that is the shorthand phrase adopted in the case law to describe speech or petitioning activities. (See, e.g., *ibid.*; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*) [interpreting § 425.16, subd. (b)(1), to require that the court first decide whether "the challenged cause of action is one arising from protected activity"].) Four categories of "protected activity" are set forth in section

---

complaint against county and its employees based on statements employees made in investigatory report).

[6] See *Schaffer v. City and County of San Francisco* (2008) 168 Cal.App.4th 992, 1004 (Anti-SLAPP statute "merely attempts to insulate [defendants] from having to litigate plainly *unmeritorious* lawsuits . . . . If, in fact, there *is* merit to the plaintiff's cause of action, the plaintiff can avoid dismissal simply by establishing a probability of prevailing."); *Flatley v. Mauro* (2006) 39 Cal.4th 299, 312 (*Flatley*) (Section 425.16 " ' "establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early state of the litigation." ' ").

425.16, subdivision (e), which defines an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue.' " Two of these categories—set forth in subdivision (e)(2) and (4)—are invoked by Defendants here: "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (§ 425.16, subd. (e)(2)), and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)).

If a court concludes the activity at issue is protected by subdivision (e), it turns to the second step: " ' "it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." ' " (*Barry*, *supra*, 2 Cal.5th at p. 321.) "The court ' " 'accept[s] as true the evidence favorable to the plaintiff [citation] and evaluate[s] the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " ' " (*Ibid.*) Courts "do not resolve the merits of the overall dispute, but rather identify whether its pleaded facts fall within the statutory purpose, 'to prevent and deter "lawsuits . . . brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." ' " (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 54.) The plaintiff is required to " 'show . . . there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment.' [Citation.] 'The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' " (*City of Costa Mesa*, *supra*, 214 Cal.App.4th at p. 376.) " ' "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute . . . is a SLAPP, subject to being stricken under the statute." ' " (*Barry, supra*, 2 Cal.5th at p. 321.)

On appeal, we review the trial court's ruling on Defendants' anti-SLAPP motion de novo. (*Flatley, supra,* 39 Cal.4th at p. 325.) And in doing so, we follow the same two-step analysis (outlined above) as the trial court: "[W]e neither 'weigh credibility

9

[nor] compare the weight of the evidence. Rather, . . . [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Id.* at p. 326.)

### B.    The First Step of the Anti-SLAPP Analysis

In applying section 425.16, subdivision (b)(1), the mode of proceeding and the applicable analysis at the often-elusive first step have been worked out in some detail in the case law. "[T]he court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) "To determine whether a cause of action arises from protected activity, we disregard its label and instead examine its gravamen 'by identifying "[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim." ' [citation], i.e., ' "the *acts on which liability is based*," ' not the damage flowing from that conduct." (*Wilson v. Cable News Network, Inc.* (2016) 6 Cal.App.5th 822, 831, review granted Mar. 1, 2017, S239686 (*Wilson*); see *Navellier*, *supra*, 29 Cal.4th at pp. 91–95; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*) ["the statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech"].)

"A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062 (*Park*).) "Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' [Citations.] . . . [T]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' " (*Id.* at pp. 1062–1063.) "If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger

10

application of the anti-SLAPP statute." (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272; see *City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 767 (*Singletary*) ["the question is whether the protected activity is merely an incidental part of the cause of action"].)

Essentially, the "court must 'distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity. Prelitigation communications . . . may provide evidentiary support for the complaint without being a basis of liability.' [Citation.] '[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' " (*Wilson*, *supra*, 6 Cal.App.5th at p. 832, rev. granted; see *Navellier*, *supra*, 29 Cal.4th at p. 89.) The most recent guidance provided by our Supreme Court is that, in teasing out whether we are dealing with protected conduct under section 425.16, subdivision (b), "courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park*, *supra*, 2 Cal.5th at p. 1063.)

Sometimes, a challenged cause of action or causes of action will arise from both protected and unprotected activity. Under *Baral*, "[w]hen relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at [the first step of the anti-SLAPP analysis]. If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken. Allegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support

11

a distinct claim on which the plaintiff has shown a probability of prevailing." (*Baral*, *supra*, 1 Cal.5th at p. 396.)[7]

### 1.   *The First Through Fifth Causes of Action*

#### a.   <u>The City</u>

Insofar as the first through fifth causes of action are asserted against the City, we think the trial court was correct to conclude that they do not arise from protected activity. Through these five claims, Area 51 seeks to hold the City legally accountable for, in essence, an alleged breach of contract—i.e., the act of ending a long-standing arrangement to license the NWT for Area 51's events upon confirmation of availability by "soft hold." Although the claims are cast differently, under distinct legal theories, the act of reneging on a commitment to license the NWT is an indispensable feature in all of them. In the breach of contract claim, it is the element of breach[8]; in the three interference claims, it is the element of disruption of a third-party contract or frustration of an economic opportunity[9]; and in the Business and Professions Code section 17200

---

[7] Defendants take the position that *Baral* marks a sharp doctrinal break in which the California Supreme Court has disavowed the "gravamen" test and replaced it with an analysis focusing exclusively on whether the alleged protected conduct is merely of "evidentiary" significance and therefore may be said to be " ' "merely incidental" ' or ' "collateral" ' to the unprotected conduct." (*Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1167, 1169–1170.) In recent years, our Supreme Court has continued to refine its approach to drawing the critical "distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity . . . ." (See *Park*, *supra*, 2 Cal.5th at p. 1064 [denial of faculty tenure case where oral and written communications preceding tenure decision did not form the basis of alleged liability for discrimination]; *Baral*, *supra*, 1 Cal.5th at p. 395 [disapproving use of "primary right" theory of liability to determine whether a cause of action is based on protected activity].) We do not see in the continuing evolution of the law on this point any fundamental shift in the nature of the "gravamen" test as it has been applied since *Navellier* and *City of Cotati*. (See *Gaynor v. Bulen* (2018) 19 Cal.App.5th 864, 886 ["under *Park* and *Baral*, a court must continue to analyze whether the allegations of protected activity within each 'claim' are incidental or whether the principal thrust of the claim triggers anti-SLAPP protection"]; *Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 588–590 [at least in some circumstances, "the principal thrust/gravamen analysis remains a viable tool by which to assess whether a plaintiff's claim arises out of protected activity"].)

12

claim, it is the unfair competition element. In none of these five causes of action does Area 51 seek to impose liability on the City for the act of sending the May 19 email which conveyed its decision not to deal further with Area 51, or the March 11 email which Area 51 alleges created a contract to allow use of the NWT—i.e., the allegedly protected activity. The communications that led to and that followed the alleged injury-producing conduct—which is, at bottom, refusal to license to Area 51—are merely incidental to the asserted claims. (*Park*, 2 Cal.5th at p. 1060 ["[A] claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity. Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted."]; see also *Shahbazian v. City of Rancho Palos Verdes* (2017) 17 Cal.App.5th 823, 826 [governmental entity's decision to issue or deny a building permit is not protected activity under § 425.16].)[10]

---

[8] Complaint, § 35 ("Defendants failed to reserve the Property for Plaintiff, and further, refused to license or make the Property available during the confirmed reservation dates.").

[9] Complaint, § 47 ("Defendants acted intentionally to disrupt and frustrate Plaintiff's relationship with Third Parties."), *id.,* § 55 ("Defendants engaged in wrongful conduct through misrepresentation, interference with economic and contractual relations, breach of contract, and violation of the Business and Professions Code.").

[10] In an effort to avoid this conclusion, the City re-characterizes Area 51's complaint as one for anticipatory breach of contract, which it contends is a theory of liability that can only be supported by proving up a communication about future conduct. The City states: "There can be no anticipatory breach of a contract without communication by words or conduct that the breaching party will not perform." (Italics omitted.) Putting to one side the fact that the complaint does not in terms allege anticipatory breach, we are not persuaded the City's re-characterization of the complaint changes the analysis. Under Area 51's theory of liability, the liability-producing conduct here was the City's decision to end the licensing relationship (whether that decision is doctrinally categorized as a breach of contract or as an anticipatory repudiation of a contract), not the expressive act of declaring an end to the relationship by email. (See

13

Defendants point out, correctly, that "conduct alleged to constitute breach of contract *may* also come within constitutionally protected speech or petitioning." (*Navellier*, *supra*, 29 Cal.4th at p. 92, italics added; see also *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 473.)  Rather than look to *Kajima*, *supra*, 95 Cal.App.4th 921, *Blackburn*, *supra*, 116 Cal.App.4th 670, and *Wang*, *supra*, 153 Cal.App.4th 790, the trio of cases relied upon by the trial court for the idea that this case is exempt from anti-SLAPP scrutiny because "the focus of the claims is on the parties' business dealings," Defendants rely on a series of cases they say are more consistent with *Navellier*—*Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264 (*King*), *Vivian v. Labrucherie* (2013) 214 Cal.App.4th 267 (*Vivian*), *Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873 (*Digerati Holdings*), *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467 (*Feldman*), *City of Costa Mesa*, *supra*, 214 Cal.App.4th 358, and the California Supreme Court's recent decision in *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409 (*Vasquez*).[11]

---

*Mission Beverage Company v. Pabst Brewing Company, LLC* (2017) 15 Cal.App.5th 686, 702 ["Mission's claims attack Pabst's decision to repudiate the Agreement; . . . the fact that the repudiation was communicated through a letter does not alter the basis of those claims"].)

[11] At the back of the parties' debate about which of these two lines of cases to apply is Defendants' assertion that *Kajima*, *Blackburn*, and *Wang* are no longer good law. *Kajima* relies on *Ericsson GE Mobile Communications, Inc. v. C.S.I. Telecommunications Engineers* (1996) 49 Cal.App.4th 1591, 1603 (*Ericsson*).  Because *Navellier* rejected the suggestion in *Ericsson* that " 'breach of contract or fraud actions where the act of the [defendant] relates to the formation or performance of contractual obligations and not . . . to the exercise of the right of free speech' " are not covered by the anti-SLAPP statute (*Navellier*, *supra*, 29 Cal.4th at p. 91, quoting *Ericsson, supra,* 49 Cal.App.4th at pp. 1601–1602), the City argues that the Supreme Court has effectively abrogated *Kajima*, and thus, implicitly, *Blackburn* and *Wang*, which cite and follow *Kajima*.  We do not read *Navellier*—or *Kajima*, *Blackburn*, and *Wang*, for that matter— so broadly.  In *Navellier*, the Supreme Court simply rejected the blanket rule some Courts of Appeal had stated—which was that the anti-SLAPP statute "categorically excludes any

14

We think Defendants' cases are distinguishable, at least to the extent Area 51's first through fifth causes of action are asserted against the City. In *King*, the court found the plaintiff's "cause of action for breach of contract [to be] based on the Kings' submission of the High Density Tract Map to the planning commission and city council," whereas here Area 51's first through fifth causes of action against the City are based on an alleged act of breach of contract. (*King*, *supra*, 157 Cal.App.4th at p. 272.) In *Vivian*, the court held that, because the plaintiff was trying to "impose liability on [the defendant] for having made her statements to the internal affairs investigators and in her family court papers," the plaintiff's action was " 'based on' that activity and [thus] [came] within the scope of section 425.16." (*Vivian*, *supra*, 214 Cal.App.4th at p. 274.) Here, Area 51 is not attempting to impose liability on the City for "having made . . . statements . . . ." (*Ibid.*) The communicative acts by others preceding or otherwise made in connection with the City's alleged breach of contract are merely collateral to, or evidence that may be probative of, Area 51's theories of liability. (See *Wilson*, *supra*, 6 Cal.App.5th at pp. 831–832, rev. granted; *King*, *supra*, 157 Cal.App.4th at p. 272.)

In *Digerati Holdings*, the court held the challenged cause of action arose out of "statements . . . made in anticipation of a lawsuit," not out of a breach of an agreement, as alleged here. (See *Digerati Holdings*, *supra*, 194 Cal.App.4th at pp. 887–888.) The court in *Feldman* held as protected activities the defendant's "threats [to evict the plaintiff], the service of the three-day notice, and the filing of the unlawful detainer action." (*Feldman*, *supra*, 160 Cal.App.4th at p. 1484.) But here, Area 51 is not alleging any conduct by the City connected to the pursuit of litigation or possible litigation; rather, as stated in detail above, it is alleging the City ended an alleged agreement to license the NWT to Area 51 upon any confirmation by "soft hold," thus interfering with Area 51's third-party agreements. Finally, in *City of Costa Mesa* the court held the plaintiff was "suing for relief based on the oral statements, not challenging the underlying acts (the

particular type of action [e.g., breach of contract claims] from its operation." (See *Navellier*, *supra*, 29 Cal.4th at p. 92.)

15

refusal of the City and its employees to issue licenses),'" and the action thus arose from protected activity within the statute. (*City of Costa Mesa*, *supra*, 214 Cal.App.4th at p. 375.) In contrast, Area 51 is indeed challenging the City's underlying act of refusing to license. That conduct is the gravamen of each of the first five claims it asserts against the City. And as noted above, the surrounding communications are merely evidence of its refusal.

In *Vasquez*, following a vote by the Montebello City Council in favor of entering a municipal waste disposal contract with a private party, it then came to light that some of those members may have had conflicts of interest due to certain financial contributions to their campaigns, among other things. (*Vasquez*, *supra*, 1 Cal.5th at pp. 413–416.) Although the district attorney declined to prosecute the members of the city council, the City of Montebello sued them along with the city administrator who helped negotiate the contract terms, alleging a single cause of action that charged unlawful conflict of interest pursuant to Government Code section 1090. (*Vasquez, supra,* at pp. 413–415.) The defendants met the claim with an anti-SLAPP motion, which the trial court denied. (*Id.* at p. 415.) After an affirmance by the Court of Appeal, the California Supreme Court reversed, holding "the council members' votes, as well as statements made in the court of their deliberations at the city council meeting where the votes were taken, qualify as 'any written or oral statement made before a legislative . . . proceeding.' (§ 425.16, subd. (e)(1).)" (*Vasquez, supra,* at pp. 422–423.) The court further held "[a]nything [the council members] or City Administrator Torres said or wrote in negotiating the contract qualifies as 'any written or oral statement or writing made in connection with an issue under consideration or review by a legislative . . . body . . . .' (§ 425.16, subd. (e)(2).)" (*Vasquez, supra,* at p. 423.) Unlike the council members' votes or the administrator's negotiations in *Vasquez*, the City's action in allegedly breaching an agreement here was not itself protected activity under the statute. (See *id.* at pp. 422–423.)

16

b.     The Individual City Defendants and the PM Defendants

The fact we can find some unprotected conduct at the root of the first through fifth causes of action does not end our step one analysis of those claims.  Under the rule in *Baral*, we must disregard the unprotected conduct and focus on whether any non-incidental protected conduct is charged, even just in part.  (*Baral*, *supra*, 1 Cal.5th at p. 396.)  While we view the gravamen of the first through fifth causes of action, at bottom, as an effort to hold *the City* accountable for failing to make space available at NWT on dates reserved by Area 51, we reach a different conclusion with respect to the Individual City Defendants and the PM Defendants.  Because we cannot say that the communicative acts alleged as liability-producing conduct by the Individual City Defendants and the PM Defendants are merely "incidental" to the claims on which they are named—to the contrary, those acts are the basis for suing them on an agency theory— we think that, as against them, the first through fifth causes of action arise from protected activity under section 425.16, subdivision (e)(2).[12]

*Vasquez* provides some guidance here.  In that case, as noted above, the Supreme Court found that the allegedly corrupt conduct (voting for a municipal waste hauling contract, in the case of city council member defendants, and negotiating it, in the case of a city administrator defendant) arose from protected activity.  The *Vasquez* opinion draws a distinction between, on the one hand, claims seeking to impose liability against a governmental entity, and, on the other, claims seeking to impose liability for the expressive activity of officials through whom a government entity must act.  In doing so, the Court noted the "distinction between action taken by a government body and the expressive conduct of individual representatives" previously recognized in *San Ramon*.  (*Vasquez*, *supra*, 1 Cal.5th at p. 425, citing *San Ramon*, *supra*, 125 Cal.App.4th 343.)  In *San Ramon*—which found the anti-SLAPP statute inapplicable to claims against the board of a county employees' retirement association—a public entity, the board itself,

_____

[12] Having found section 425.16, subdivision (e)(2) to apply, we need not, and do not, decide whether section 425.16, subdivision (e)(4) also applies.

17

was being sued for making a pension contribution decision. Pointing out that no individuals were sued there, the Supreme Court rejected the plaintiffs' contention that applying the anti-SLAPP statute to the allegedly corrupt conduct of the individual defendants in *Vasquez* would unduly insulate governmental action from legal accountability. "It is not necessary to sue government officers in their personal capacities to challenge the propriety of a government action," the court explained. (*Vasquez*, *supra*, 1 Cal.5th at p. 426.)

We agree with the observation made in a supplemental brief filed by the City and the Individual City Defendants that *Vasquez* "does for claims that mix together co-defendants what *Baral* . . . did for causes of action that mix together protected and unprotected conduct: [I]t emphasizes that each person's conduct is to be analyzed separately." A party-by-party mode of analysis makes a difference here. While the thrust of the first five causes of action as against the City itself is an alleged breach of contract, Area 51 does not allege that the Individual City Defendants or the PM Defendants were themselves contracting parties; the sole basis for asserting liability against these other parties is what they did on behalf of the City, and as alleged here, that conduct is expressive in nature. For these parties—the PM Defendants via Elgarico's March 11 email confirming reserved dates, and the Individual City Defendants via Mocanu's May 19 email announcing that the City's "relationship with Area 51 is over"—the sole basis of their alleged liability appears to be communication, either in saying things that formed an alleged contract with the City, or in saying things that announced the end of that contract. Under a plain language reading of the anti-SLAPP statute, all of these communicative acts qualify as "written or oral statement[s] or writing[s] . . . made in connection with an issue under consideration . . . by a[n] . . . executive . . . body." (See § 425.16, subd. (e)(2).)

We find unpersuasive Area 51's rejoinder that there was no "official proceeding" in play here and thus that subdivision (e)(2) of the statute has no application. Area 51 alleges that the City, acting through the Individual City Defendants and the PM

18

Defendants, committed to issue a license to Area 51 to use space in the NWT and then refused to honor that promise. This theory of liability rests on Elgarico's March 12 confirmation email and the discussions between Russo and Mocanu (mentioned in Mocanu's May 19 email) that led to the end of the City's relationship with Area 51. Given Area 51's agency allegations, it can fairly be inferred that all of this communicative activity—of necessity—took place pursuant to Russo's executive authority as City Manager. To be deemed "under consideration" by an "executive body," a matter must be given " ' " 'attentive thought, reflection, [or] meditation.' " ' " (*City of Costa Mesa*, *supra,* 214 Cal.App.4th at p. 373.) There is no talismanic significance to "*official* or *formal* proceedings." (*Ibid.*, italics added.) Something more than ministerial action is required, but any form of deliberative executive decision-making will suffice. (*Ibid.*; see *Maranatha Corrections, LLC v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1075, 1085.) Here, the process by which Russo arrived at and implemented a decision about licensing the City's property—working informally with, and through, others—cannot be described as ministerial.

Area 51's fall-back argument is that the alleged communicative acts by the Individual City Defendants and the PM Defendants were not undertaken in connection with a "public issue." This secondary line of argument is also contrary to the language of the statute, plainly read. The text of section 425.16, subdivision (e)(2) contains no "public issue" or "issue of public interest" requirement beyond a showing the communication was made in connection with an issue under consideration by an executive body. (See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1119 ["[A] plain reading of subdivision (e)(1) and (2) . . . imports no additional 'public issue' requirement[.]"].) To satisfy the "official proceeding" language in section 425.16, subdivision (e)(2), no additional showing need be made if *any* written or oral statement in connection with an issue under consideration by an executive body is involved. (*Briggs, supra,* at pp. 1116–1117 [§ 425.16, subd. (e)(2) protects " 'free speech and petition conduct aimed at advancing self government, as well as conduct aimed at

19

more mundane pursuits' "].)  Substantive inquiry into the nature of the issue is not necessary as long as some type of official decision-making, formal or informal, is involved.  Under section 425.16, subdivision (e)(2), the pendency of an issue before a government body is a proxy for its character as public in nature.

> 2. *The Sixth Cause of Action*

Our analysis of the sixth cause of action, a negligent misrepresentation claim, is more straightforward than it is for the first five because this claim is based purely on expressive conduct.  In the sixth cause of action, Area 51 alleges: "Plaintiff was harmed because Defendants negligently misrepresented an important fact—namely that their confirmed reservations of the Property [in the March email] would be honored."  For the reasons explained above in section II.B.1 with respect to section 425.16, subdivision (e)(2), we conclude that the alleged misrepresentations on which the sixth cause of action is based constitute anti-SLAPP protected activity.

## C. The Second Step of the Anti-SLAPP Analysis

Having concluded that all six of Area 51's causes of action arise from protected activity—in part, or entirely—we proceed to the second step of the anti-SLAPP analysis for the first five causes of action insofar as they are pleaded against the Individual City Defendants and the PM Defendants, and for the sixth cause of action insofar as it is pleaded against all Defendants.  Because we conclude that the first though fifth causes of action do not involve protected speech or actions by the City, we do not reach the second prong of the anti-SLAPP analysis of whether Area 51 can show a probability of prevailing on those claims as pleaded against it alone.  (*City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1309.)

"We . . . evaluate the defendants' evidence only to determine if it defeats that submitted by the plaintiff as a matter of law."  (*Wilson*, *supra*, 6 Cal.App.5th at pp. 831–833, rev. granted.)  "[I]n order to establish the requisite probability of prevailing [citation], the plaintiff need only have ' "stated and substantiated a legally sufficient claim." '  [Citation.]  'Put another way, the plaintiff "must demonstrate that the complaint

20

is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier, supra,* 29 Cal.4th at pp. 88–89.) It was not enough simply to replead, as Area 51 did after Defendants' demurrer was sustained. (*DuPont Merck Pharmacuetical Co. v. Superior Court.* (2000) 78 Cal.App.4th 562, 568.) To survive Defendants' motion, the burden was on Area 51 to come forward with admissible evidence showing a probability of prevailing on each claim exposed to step two anti-SLAPP analysis, enough to make out a viable prima facie case at trial. That burden was not particularly high (*Navellier, supra*, 29 Cal.4th at p. 94 ["claims with the requisite minimal merit may proceed"]), but we conclude Area 51 failed to meet it in the following respects.

21

1.    *The First Through Fifth Causes of Action As Pleaded Against the Individual City Defendants and the PM Defendants*

Area 51's evidentiary showing in opposition to the anti-SLAPP motion is embodied in the declaration of its CEO, John Walker.  The gist of the theory offered in this declaration appears to be that, following the termination of a "Long Term Agreement" between the City and Area 51 in October 2013, the course of dealing between the parties from October 2013 to May 2014 created some sort of contract or contracts under which the City was bound to provide space at NWT whenever PM Realty "confirmed" the availability of that space, but that the City reneged on this commitment due to some personal animus "the Defendants have against [him]" and a desire to do business with someone else.  As pertinent to the first cause of action, the Walker declaration makes a prima facie case under a theory of breach of a contract implied from conduct, based on his sworn assertions about settled practice established by many years' history of doing business with the City.  But as noted above, Area 51 does not allege— and Walker does not suggest—that any of the Individual City Defendants or the PM Defendants was *a party* to such a contract and therefore liable for its breach.  We see no basis in law for imposing breach of contract liability on a stranger to this alleged contract under an agency theory, and the Walker declaration does not supply such a basis in fact.[13]

Nor are we persuaded there is enough here to show extra-contractual liability based on the second through fifth causes of action as alleged against the Individual City Defendants or the PM Defendants.  The Individual City Defendants contend that they have statutory immunity on various grounds, and all Defendants argue that Area 51 has failed even to plead the requisite elements of these claims sufficiently, as shown by the sustaining of their general demurrer.  In response, Area 51 posits that no Defendant is immune from liability, but does little to support this contention or to rescue its extra-contractual claims, other than to recite claim elements from the case law, cite conclusory

_____

[13] Cf. 3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency, § 196, pp. 248– 249 (agent not ordinarily liable on written contract he executes on behalf of a disclosed principal, absent bad faith); Rest.3d, Agency, § 6.01.

22

statements drawn from its complaint, and refer to evidence not properly brought before the trial court or this court.[14] We need not canvass the applicable law with respect to each of the identified defects in Area 51's theories of extra-contractual liability in the first through fifth causes of action and then proceed to analyze every thread of the parties' contending positions. It suffices to say, as a matter of law, that the Walker declaration (1) fails to show any wrongful act that is sufficiently independent of the contract duty Area 51 sues upon to support the alleged interference torts, even assuming such a contract duty could be established (which defeats the second, third, and fourth causes of action);[15] and (2) fails to "explain with any reasoned argument or authority how [anything alleged here was an] unlawful, unfair or fraudulent business act[] or practice[] within the meaning of the unfair competition law" (which defeats the fifth cause of action).[16]

### 2. *The Sixth Cause of Action*

We agree with Defendants that Area 51 has not shown a prima facie case of liability on the sixth cause of action, with respect to any of them. Neither the complaint nor the showing Area 51 made in the Walker declaration demonstrates with adequate particularity that a false statement was made without reasonable grounds to believe in its truth, accompanied by justifiable reliance and resulting damages. (*Intrieri v. Superior*

---

[14] The extra-record references are in violation of California Rules of Court, rule 8.124(b)(3). We therefore do not consider them.

[15] *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1991) 7 Cal.4th 503, 515 ("conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law"); *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 ("a plaintiff seeking to recover damages for interference with prospective economic advantage must plead and prove as part of its case-in-chief that the defendant's conduct was 'wrongful by some legal measure other than the fact of interference itself' ").

[16] *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1244.

23

*Court* (2004) 117 Cal.App.4th 72, 86 [describing required elements of negligent misrepresentation claim]; see *Cadlo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513, 519 ["Each element in a cause of action for fraud or negligent misrepresentation must be factually and specifically alleged"].) While inferences about these required elements might be drawn from the facts Area 51 has shown, and while, by a series of further inferences, Area 51's showing might support one or more of the first five causes of action as pleaded against the City alone, we decline to fill in the details necessary to support the misrepresentation claim alleged in the sixth cause of action.

### D.    Attorney Fees and Costs

Defendants argue they are entitled to attorney fees and costs as prevailing parties on their anti-SLAPP motion. Area 51 counters with its own request for attorney fees because, "[g]iven the continuous flow of unambiguous case law in the past decade, any reasonable attorney should be aware that a business dispute that simply mentions incidental protected activity is not subject to the anti-SLAPP statute."

Subdivision (c)(1) of section 425.16 provides in full: "Except as provided in paragraph (2) [which is not relevant here], in any action subject to subdivision (b), a *prevailing defendant* on a special motion to strike shall be entitled to recover his or her attorney's fees and costs. If the court finds that a special motion to strike *is frivolous or is solely intended to cause unnecessary delay*, the court shall award costs and reasonable attorney's fees to a *plaintiff* prevailing on the motion, pursuant to Section 128.5." (Italics added.) "A defendant that successfully moves to strike a plaintiff's cause of action, whether on merits or non-merits grounds, has 'prevailed' on the motion, and therefore is entitled to attorney's fees and costs." (*Barry*, *supra*, 2 Cal.5th at p. 327.) "A 'prevailing defendant' within the meaning of [the statute] includes a defendant whose anti-SLAPP motion was granted as to some causes of action but not others." (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1267 (*Huntingdon*); see also *Moran v. Endres* (2006) 135 Cal.App.4th 952, 954–

956 [upholding the trial court's denial of attorney fees to defendant after striking only one of plaintiffs' 11 causes of action under the anti-SLAPP statute].)

" 'The anti-SLAPP statute reflects the Legislature's "strong preference for awarding attorney fees to successful defendants." [Citation.] The term "prevailing party" must be "interpreted broadly to favor an award of attorney fees to a partially successful defendant." [Citation.] However, a fee award is not required when the motion, though partially successful, was of no practical effect. [Citation.] "[A] party who partially prevails on an anti-SLAPP motion must generally be considered a prevailing party unless the results of the motion were so insignificant that the party did not achieve any practical benefit from bringing the motion. The determination whether a party prevailed on an anti-SLAPP motion lies within the broad discretion of [the] trial court." [Citation.]' " (*Singletary*, *supra*, 206 Cal.App.4th at p. 782; see also *Huntingdon*, *supra*, 129 Cal.App.4th at p. 1267 [" 'Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees.' "].)

Under these standards, we conclude that, since the Individual City Defendants and the PM Defendants are the prevailing parties on all causes of action, they are entitled to awards of fees and costs reasonably allocable to achieving that result, including fees and costs incurred on appeal. With respect to the request for attorney fees and costs from the City, it too is a victorious party in part, so we conclude that it may be entitled to an award of fees and costs reasonably allocable to achieving that victory, including appellate fees and costs. (See *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1020 [partial success by defendant filing anti-SLAPP motion generally "reduces but does not eliminate the entitlement to attorney fees"]; see also *Moran v. Endres, supra,* 135 Cal.App.4th at pp. 954–956 [fees and costs may be denied to a partially prevailing defendant whose motion achieved little or no practical benefit].) The trial court is best positioned to determine whether to award fees and costs to the City, and to determine, as to all Defendants, the appropriate allocations and the amounts reasonably awardable. (See *Huntingdon*, *supra*, 129 Cal.App.4th at p. 1267.)

25

Finally, as to the fee request from Area 51, it is a prevailing party in part. But as a prevailing *plaintiff,* Area 51 is only entitled to fees if the City's motion to strike was "frivolous" or "solely intended to cause unnecessary delay." (§ 425.16, subd. (c)(1).) "A determination of frivolousness requires a finding the anti-SLAPP 'motion is "totally and completely without merit" (§ 128.5, subd. (b)(2)), that is, "*any reasonable attorney would agree such motion is totally devoid of merit.*" ' " (*Moore v. Shaw* (2004) 116 Cal.App.4th 182, 199.) In light of the developing case law surrounding the complex issues presented in the City's motion (which we have discussed in detail above), we conclude the motion, as a matter of law, does not meet the requisite frivolousness standard: When the City filed its motion, reasonable attorneys could have disagreed as to its merits. For the same reason, we see no basis to conclude the motion was filed solely for the purpose of causing unnecessary delay. Accordingly, no award of fees to Area 51 is appropriate here.

## III. DISPOSITION

The trial court's order denying Defendants' anti-SLAPP motion is affirmed with respect to Area 51's first five causes of action as pleaded against the City. In all other respects, the court's order denying the motion is reversed, and the case is remanded for consideration of attorney fees and costs awardable as set forth above.

_____
Streeter, J.

We concur:


_____
Ruvolo, P.J.


_____
Rivera, J.*


*Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution

A144645/*Area 51 Productions, Inc. v. City of Alameda*

Trial Court: Alameda County Superior Court

Trial Judge: Hon. Stephen Pulido

Counsel:

Farella Braun + Martel, Kelly A. Woodruff, Thomas Mayhew, and Alexander M. Porcaro for Defendants and Appellants City of Alameda, John Russo, and Nanette Banks Mocanu.

Seyfarth Shaw, Michael J. Burns, and Jason M. Allen for Defendants and Appellants PM Realty Group, Tiffany McClendon, and Maria-Delia Elgarico.

Kyndra S. Miller for Plaintiff and Respondent.