Filed 5/31/23  Shang v. Jin CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HONGHUA SHANG, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JING JIN et al., <br><br> Defendants and Appellants. | B315232 <br><br> (Los Angeles County Super. Ct. No. 21PSCV00187) |

APPEAL from an order of the Superior Court of Los Angeles County, Gloria White-Brown, Judge.  Affirmed.

Demler, Armstrong & Rowland, Robert W. Armstrong and Pennie P. Liu for Defendants and Appellants.

Honghua Shang, in pro. per.; RELAW, Jennifer Felten and Timothy S. Camarena for Plaintiff and Respondent.

Plaintiff Honghua "Harry" Shang entered into a listing agreement to sell a home belonging to the father of defendant Jing Jin. Seven months after the closing, Jin posted multiple negative reviews of Shang and his business on several websites including Yelp, Facebook, CCYP.com (CCYP), and Google. Jin's husband, defendant Benjamin Lee, also posted a negative review about Shang. Shang sued Jin and Lee for defamation. Defendants moved to strike plaintiff's claim pursuant to Code of Civil Procedure section 425.16,[1] California's "anti-SLAPP" statute. After continuing the hearing so the parties could depose Jin's parents, the trial court denied defendants' motion to strike, finding that plaintiff had demonstrated a probability of prevailing on the claim. Defendants appeal from the order denying their motion. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. The parties and the real estate transaction**

Shang is a licensed real estate broker and the principal of Great Wall Realty and Echain Escrow. In March of 2020, Great Wall Realty entered into a written listing agreement with Jin's father to sell his home in Azusa. The listing price was $499,900. The agreement provided for a 2.5 percent commission to the buyer's agent and no commission to plaintiff, but it also required the sellers to open escrow with Echain Escrow, Shang's escrow company. Jin overheard a telephone conversation between her parents and Shang, in which Shang explained he could afford to take no commission on the sale of the house because he earned his fee through Echain Escrow. Jin also attached an exchange of

---

[1] All further statutory references are to the Code of Civil Procedure.

text messages with plaintiff in which he confirmed that he would charge no commission.

Jin asserts that her parents "do not speak or read English fluently." Shang is fluent in Chinese and markets his services to the Chinese-speaking community, advertising on websites and in Chinese-language media targeted to that community. According to Jin, because her father "cannot read English," he asked her to review the listing agreement. From time to time Jin's mother, who called herself "Sunny," communicated with Shang by email in English. For example, Jin's mother sent the following e-mail that was both written in English and contained a link to an English-language website: "Can we please get someone to take photos today? Tomorrow [it] will start raining again and it may affect quality of the photos. [¶] I don't think my son-in-law can write the description as professional as you are, and he's very busy with his work and most importantly, he's not our agent. Writing descriptions, taking photos, putting up signs, hosting open houses, reviewing offers, pretty much everything related to marketing the house should be seller agent's responsibility by standard and as we had discussed over the phone. [¶] https://www.moneycrashers.com/real-estate-agent-responsibilities-duties/ [¶] Thank you, [¶] Sunny." The record contains other examples of brief emails, ostensibly sent by Jin's mother, written in English and sent in response to e-mails from Shang transmitting transactional documents written in English.[2]

---

[2] On April 10, 2020, Jin's mother replied as follows to an e-mail from plaintiff: "Hi Harry, [¶] Please see attached the file of signature documents escrow. [¶] Thanks! [¶] Sunny." On May 17, 2020, Jin's mother emailed signed documents for the pest

3

Jin's father also completed and signed several English-language transactional documents in connection with the sale of the house.  These documents include a Real Estate Transfer Disclosure Statement that was signed by Shang and by Jin's father on March 29, 2020.  The form includes a number of English words filled in to describe features of the house.  For example, the word "bathrooms" is added to describe the location of exhaust fans; the words "outside house" to describe the location of a gas starter, and the word "shingle" to describe the type of roof on the house.  Elsewhere on the form, after checking the box "yes" stating that the seller's awareness of "significant defects/malfunctions" on the property, the words "Fence, Drive Way, Concrete, Kitchen, Cabinet, Toilet, painting inside and outside" are added.  On the same date Jin's father signed and returned to Shang a "Seller Property Questionnaire" on which the words "Fence, Drive Way, Concrete, Kitchen, Cabinet, Toilet, painting inside and outside" are written in response to a question about repairs or alterations to the property.  Jin's father also signed a "Residential Earthquake Hazards Report" form that has boxes checked (Yes/No/Doesn't Apply/Don't Know) responding to a series of questions about the construction of the house.

Jin's father accepted an offer to purchase the home for $525,000, an amount in excess of the listing price.  According to Shang, Jin's father was pleased with the results and offered to pay him what amounted to a bonus equal to 1 percent of the purchase price, or $5,250.  Jin's parents deny agreeing to the commission.  Jin states that she and her parents were "extremely upset with plaintiff's misrepresentation and failure to abide by

control contractor with the following message:  "Hi Harry,  [¶] Please see signed documents.  [¶]  Thanks!  [¶]  Sunny."

4

the terms of the original agreement." Regardless, the record confirms that at an in-person meeting on June 18, 2020, prior to the closing on June 24, 2020, Jin's father signed a "Seller's Final Settlement Statement" showing a "commission" payable to Great Wall Realty in the amount of $5,250, in addition to the commission payable to the buyer's broker and the escrow fee payable to Echain Escrow. The next day plaintiff emailed Jin's father an escrow instruction providing for a commission of $5,250 payable to Great Wall Realty at the time of closing. According to Jin, she did not have an opportunity to review the documents and was not present when her father signed them. Jin does not offer any explanation for why neither she nor her father objected to the commission between June 18, when her father signed the settlement statement and June 24, when the transaction closed.

At the closing, Jin's father received the amount shown on the escrow statement he had agreed to on June 18, 2020. In February of 2021 – more than seven months after the sale of Jin's parents' home closed – Shang became aware of posts on various websites criticizing him and his business.[3] On February 10, 2021, using the pseudonym "Jean J.," Jin made the following post on Yelp: "Harry/Great Wall/Echain Realty is the worst possible realtor anyone could ever work with. The reason my mom found him was because of his so-called 'free commission' promise, and nope, there was no free lunch and his attitude and behavior

---

[3] We rely on the actual posts themselves, rather than on plaintiff's description of those posts in his complaint. However, we have not considered posts included as exhibits to Jin's declaration in support of defendants' special motion to strike that are written entirely in Chinese, and are not accompanied by the translation required by rule 3.1110(g) of the California Rules of Court.

proved that. Dealing with him was the worst nightmare. He took advantage of people who spoke little English like my parents and made many promises but failed to deliver. [¶] If you want to work with someone who is unprofessional and dishonest and still charges the sugar coated 'service fee' at the end, he is the one. If you want to listen to someone who is full of lies, he is the one. Do yourself a favor, don't believe the positive comments listed by other agent or his friends. LOOK FOR SOMEONE ELSE! Being his customer is the biggest mistake I have made in life!" Jin repeated this post on Yelp and on CCYP, using the pseudonym "Harry's Victim."

Also on February 10, 2021, Jin made the following post on the Facebook page for Great Wall Realty, using the pseudonym "Mandy Lau": "Harry Shang is the worst possible realtor anyone could ever work with. The reason we found him was because his so called 'free commission' ad, and yes, it was a complete lie. If you want to work with someone who is unprofessional and also charges commission, he is the one. If you want to listen to someone who is full of lies, he is the one. If you want to do yourself a favor, don't believe any positive comments listed by other agents or his friends and look for someone else. I was a client of his and this is one of the biggest mistakes I made in life!" The same posting was repeated on CCYP under the pseudonym "Harry's Victim," on a Google review for Great Wall Realty by "JJ World," and on Yelp under the name "Jean J."

On February 13, 2021, using the pseudonym "Wendy L.," Jin posted the following on Yelp and CCYP: "This review is for Harry and his business Great Wall Realty and Echain Realty. I hate writing negative reviews, but he is such a dishonest, unfaithful, and unprofessional person to work with. I 100% agree

6

with all the negative reviews, and he could be worse than their descriptions.  Not sure how this business can even last."

On February 20, 2021, Jin posted as follows on Yelp:  "The only reason my family hired Harry Shang/Honghua Shang (the owner of Echain Realty/ Great Wall Realty) was because he told us he would have 0 percent commission for selling our property.  We were skeptical at first, but he told us he wouldn't charge because he could still make money by us using his own Escrow company.  We took his word and went with him.  The fact is, he still charged commission at the end although he promised he would not.  [¶]  *Attention*  If anyone has similar experience, you can submit a complaint to California Department of Real Estate: https://www.dre.ca.gov/Consumers/FileComplaint.html (you can select multiple languages at the bottom of the page).  We need to work together to prevent this from happening again!"

Shang alleges that on January 12, 2021, Jin's husband Lee published the following post on CCYP:  " 'Tell you the truth and lies/lie.  He poses a threat to the Chinese community.  He uses his people, especially those who only speak a little English or even no English all.  He never answered the phone and claimed that "I did not receive those emails."  He also produced a digitally signed document to convince you that the agreement and terms are legal.' "

The week of February 17, 2021, a sales agent who works with Shang received a telephone call from a man complaining that Shang was " 'dishonest' " and " 'unprofessional,' " and who wanted to gather evidence of Shang's "dishonesty and unprofessionalism."  On approximately February 19, 2021, one of Shang's recent clients received a similar telephone call, this one asserting that Shang was " 'unprofessional' " and warning that

the client would be " 'in deep trouble' " if represented by Shang in the sale of his property. Both calls came from the same telephone number, which belongs to Lee.

## B. Shang's complaint and defendants' motion to strike

On March 5, 2021, Shang filed a complaint against defendants, among others, alleging a single cause of action for defamation per se. The complaint set out the posts quoted above but did not mention the telephone calls attributed to Lee. Shang requested an award of compensatory and punitive damages.

On May 13, 2021, Jin and Lee filed a motion to strike pursuant to Code of Civil Procedure section 425.16. Their motion alleged that Jin's internet postings were protected conduct because they were made in a public forum and concerned a matter of public interest and discussion. In addition, Jin asserted that the postings contained her "truthful opinions formulated based on her and her parents' interactions with plaintiff as a real estate agent," and that the sole purpose of her postings "was to share her and her family's experience with other consumers." Specifically, Jin averred that her parents were unable to speak or understand English, and denied that they had ever agreed to pay one percent of the sales price of the home to plaintiff. Rather, her parents contended that Shang sprung the commission on them when they came to Shang's office to sign escrow documents, and that Jin's father only signed the escrow instruction paying a commission to Shang because he told them that if they refused to do so they would not receive the proceeds of the sale of their home. For her part, Jin stated that it was not until February of 2021 that she learned her parents had paid a commission to plaintiff. According to her parents, they had been

8

"afraid" to tell Jin they paid the commission. According to Jin, when she contacted Shang about the commission he "did not provide a further explanation and instead implied that since Jin's father had already signed the document, there was nothing they could do."

Shang opposed Jin's and Lee's motion to strike. Shang argued that Jin's statements that he is "dishonest, unprofessional, 'the worst possible realtor,' 'took advantage of people who spoke little English,' 'made promises but failed to deliver,' and 'full of lies'" are all defamatory per se. Moreover, Shang argued that these statements not only were not opinions, but implied that Jin was privy to facts not known to those reading her posts and thus should be taken as authoritative. Finally, Shang pointed out that Jin "made the posts over several days" and that she used five different pseudonyms on five different platforms "to echo her false statements." In support of his opposition, Shang attached declarations from the recipients of Lee's telephone calls, as well as screenshots of the allegedly defamatory posts, the e-mails from Jin's mother written in English, and copies of the transactional documents signed by Jin's father.

At the hearing on defendants' motion, the court issued a tentative decision to deny defendants' motion and noted that defendants had not submitted declarations by either of Jin's parents regarding their dealings with plaintiff or their ability to speak and understand English. At defendants' request, the court continued the hearing for a month to enable the parties to depose Jin's parents. The depositions were taken on July 8, 2021, and thereafter both sides submitted excerpts from the depositions in support of their respective positions. Jin's parents both testified

9

that they were not fluent in English. Jin's mother stated she was the more fluent of the two. Jin's father testified that he felt he had no choice but to accede to Shang's request for a commission because he was told if he did not agree, he would not receive the proceeds from the sale of his home. He also testified that he had been "afraid" to tell his daughter about the commission, which is why she only learned about it seven months after the closing.

The hearing on defendants' anti-SLAPP motion resumed on July 27, 2021. This time, the court's tentative ruling was to grant the motion. Following brief argument, the court took the matter under submission and indicated that she would further consider whether Jin's posts were susceptible of a defamatory reading. At the end of the hearing, the court took defendants' motion under submission. On August 4, 2021, the court issued a minute order denying defendants' motion. In its order, the court found "that the statements at issue are reasonably susceptible to a defamatory interpretation" and "that a reasonable fact finder could conclude the published statements declare or imply a provably false assertion of fact regarding Jin's several statements, that might imply or state assertions that are simply not true." The order was served on the parties on August 4, 2021, and defendants filed a timely notice of appeal on September 1, 2021. We have jurisdiction pursuant to Code of Civil Procedure section 904.1, subdivision (a)(13).

## DISCUSSION

### A. Section 425.16 Special Motions to Strike and the Standard of Review

The anti-SLAPP statute "provide[s] for the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for

10

the redress of grievances." (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 315.) "When served with a SLAPP suit, the defendant may immediately move to strike the complaint under section 425.16." (*Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1543 (*Hansen*).) "To determine whether this motion should be granted, the trial court must engage in a two-step process." (*Ibid.*)

At the first step, "the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.) If the court determines the defendant has made the requisite showing, "it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) "The plaintiff can carry his burden by making a prima facie showing of facts that would, if proved, support a judgment in his favor." (*Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 271.) "The plaintiff need only establish that his or her claim has minimal merit to avoid being struck as a SLAPP." (*Hansen, supra*, 171 Cal.App. 4th at p. 1543.)

A claim must satisfy both prongs to be stricken under the anti-SLAPP statute. (*Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 872 (*Serova*).) An order granting or denying a motion to strike made under section 425.16 is reviewed de novo. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)

**B. Shang established a probability of prevailing**

In denying the defendants' motion, the trial court did not explicitly address whether the contested posts satisfied the first prong of the anti-SLAPP statute. Although on appeal Shang

11

disputes this issue, he did not raise it in his briefs or at argument before the trial court. Because we conclude that the trial court correctly denied defendants' motion under the second prong, we need not address this issue. (*Serova*, *supra*, 13 Cal.5th at p. 872 [". . .we may conclude a contested portion of an anti-SLAPP motion should be denied solely based on a plaintiff's showing of merit, as a sufficiently meritorious claim cannot be struck regardless of whether it arises from activity the anti-SLAPP statute protects"].) We shall assume, without deciding, that the challenged statements accusing Shang in a public forum of lying to and taking advantage of Chinese clients who spoke limited English in connection with his work as a real estate agent address an issue of public interest and therefore are protected activity within the meaning of section 425.16—thus satisfying the first prong of the anti-SLAPP analysis.[4]

We thus turn to the issue of whether Shang has met his burden to establish a probability of prevailing on his defamation claim. The trial court denied defendants' motion because it found that the statements attributed to defendants are "reasonably susceptible to a defamatory interpretation." On appeal, defendants argue that the court erred because defendants' posts are a mixture of truthful statements and nonactionable opinion. We disagree.

"The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a

---

[4] Shang contends on appeal that defendants' statements, while made on a public forum, do not concern a matter of public interest. He argues that defendants' posts amounted to private dispute over a one-time transaction and did not pertain to "any widespread practice" that he employed at his business.

12

natural tendency to injure or causes special damage." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.) " 'The sine qua non of recovery for defamation . . . is the existence of falsehood.' [Citation.]  Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected." (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112.)  That said, "[a] statement of opinion may be actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 902–903.)

The "crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court." (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 810.)  "Only once the court has determined that a statement is reasonably susceptible to such a defamatory interpretation does it become a question for the trier of fact whether or not it was so understood." (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 647.)

Defendants argue that the court erred when it determined that Shang had established a probability of prevailing because the statements at issue were made online.  They argue that online sites have been recognized as forums that invite " 'exaggerated and insulting criticisms of businesses,' " a context that defendants' assert renders their statements properly characterized as nothing more than hyperbolic rhetoric.

"[T]he mere fact speech is broadcast across the Internet by an anonymous speaker does not ipso facto make it nonactionable

13

opinion and immune from defamation law." (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 429 (*Bently*).) In any event, the cases cited by defendants are readily distinguishable. For example, defendants rely on *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1149 (*Chaker*), a case which held that statements made in the context of a paternity dispute were not defamatory in part because they were "made on Internet Web sites which plainly invited the sort of exaggerated and insulting criticisms of businesses and individuals which occurred here." The comments at issue included statements that Chaker "pick[ed] up streetwalkers and homeless drug addicts and is a deadbeat dad," comments that the court interpreted as "name calling." (*Ibid.*) The court concluded that the "overall thrust of the comments attributed is that Chaker is a dishonest and scary person. This overall appraisal of Chaker is on its face nothing more than a negative, but nonactionable opinion." (*Ibid.*) Notably, the court found that the comments lacked specificity as to the time and place of the alleged behavior, a fact that the court found would signal to the reader that there was "no factual basis for the accusations." (*Id.* at p. 1150.)

Similarly, in *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1013 (*ComputerXpress, Inc.*), the defendant's comments on an internet message board included, among others, one accusing the promoters of a company as caring "nothing about generating a genuine business, and everything about selling the stock," and another foretelling that " '[w]hen the people who have . . . been duped into this stock realize the scam they were coaxed into, my guess is there will be hell to pay.' " (*Ibid.*) Nonetheless, the court found that these posts could not reasonably be read as factual because "their tone and content

14

identified them as statements of opinion and not fact. . . . Moreover, they were replete with explicit statements of opinion, such as 'IMO [in my opinion],' 'what I think is a fraud,' 'I firmly believe,' 'is that fraud?' and 'my guess is.' " (*Ibid.*) The court also described the assertion that the promoters only cared about selling stock rather than forming a genuine business as "too vague to be taken as fact by a reasonable reader." (*Ibid.*)

Unlike *Chaker* and *ComputerXpress, Inc.*, here defendants' statements include detailed accusations about a specific real estate transaction. And even if some of the statements at issue fall into the category of " 'rhetorical hyperbole,' " such as Jin's assertion that plaintiff is the "worst possible realtor anyone could ever work with," other portions contain statements that a reasonable fact finder could conclude are declared or implied assertions of fact. Jin wrote, for instance, that "[t]he only reason my family hired Harry Shang . . . was because he told us he would have 0 percent commission for selling our property. We were skeptical at first, but he told us he wouldn't charge because he could still make money by using his own Escrow company. . . . The fact is, he still charged commission at the end although he promised he would not." She also wrote, "[Shang] . . . is the worst possible realtor anyone could ever work with. The reason my mom found him was because of his so called 'free commission' promise, and nope, there was no free lunch. . . . He took advantage of people who spoke little English like my parents and made many promises but failed to deliver. [¶] If you want to work with someone who is unprofessional and dishonest and still charges the sugar coated 'service fee' at the end, he is the one for you." These statements contain detailed factual assertions, including Shang's agreement to forgo a commission, and Jin's

15

parents limited English-speaking ability, that distinguishes them from mere name calling or negative opinion. Taken in context, the statements could be "reasonably perceived as containing actionable assertions of fact." (*Bently, supra*, 218 Cal.App.4th at p. 431.)[5]

Defendants concede that Jin made some factual statements in her online posts but argue that the statements were "basically true," and thus not defamatory. Defendants point to evidence that (1) Jin's parents asked her to help them with the real estate transaction because they struggled with English; (2) Shang made statements in the listing agreement and by text message that he would not charge a commission; (3) Shang surprised Jin's parents by including the commission at the close of escrow; and (4) Jin's parents acquiesced to Shang's demand because they were worried if they did not agree they would lose the proceeds from the sale. But in opposing the motion to strike, Shang offered evidence that tended to prove each of defendants' statements were false. Shang offered evidence that Jin's parents understood and communicated

___

[5] Even defendants' characterizations of plaintiff as "dishonest" and a "liar" are not pure expressions of opinion, because they imply that defendants are privy to facts that prove plaintiff's dishonesty. For example, Jin urges readers "not to believe" favorable reviews posted by "other agents or his friends." The implication is that she was not only posting about her own experiences but suggesting that her posts were the only unbiased ones. "[I]f the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications." (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18–19.)

in English, in the form of e-mails from Jin's mother and transactional documents completed in English and returned by Jin's father. In his declaration opposing defendants' motion, Shang testified that Jin's father agreed to pay a commission because he was happy with plaintiff's service. Rebutting Jin's assertion that the commission was a surprise to her father, Shang's evidence shows that the escrow instruction to pay a commission was e-mailed to Jin's father almost a week prior to the closing, not at the last minute when her father might reasonably fear it was too late to refuse for fear of not receiving the sales proceeds. And far from being a complete presentation of the facts of the dispute, nowhere in Jin's posts does she acknowledge that her mother communicated with plaintiff in English, that her father added English words to blank spaces in documents written in English, that he signed an escrow instruction agreeing to pay plaintiff a 1 percent commission, or that Shang sold the house for more than the listing price.

Section 425.16, subdivision (b), requires the trial court to consider plaintiff's affidavits for the purpose of determining whether sufficient evidence has been presented to demonstrate a prima facie case. " 'In making this judgment, the trial court's consideration of the defendant's opposing affidavits does not permit a weighing of them against plaintiff's supporting evidence, but only a determination that they do not, *as a matter of law,* defeat that evidence.' " (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 867, original italics.) Shang need only show that his defamation claim has at least " 'minimal merit.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.) Shang met that burden by making " ' " 'a sufficient prima facie showing of facts to sustain a favorable

judgment if the evidence submitted by the plaintiff is credited.' " ' " (*Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 488.)  Thus, the trial court properly denied defendants' special motion to strike.

### C. The trial court did not err in denying the special motion as it pertained to defendant Lee

Defendants also argue that Shang failed to show a probability of prevailing in his case against Lee because the evidence was "uncontroverted" that "he was not the author of any of the communications. . . ."  Lee specifically denies posting the review attributed to him in Shang's complaint or doing anything to encourage or assist Jin with her reviews.  Shang introduced evidence, however, that tends to show that Lee participated in the negative campaign against Shang.  The post Shang attributes to Lee in his complaint is authored by someone identified as "Ben", Lee's first name.  Lee's post was made within weeks of Jin's posts, and contained specific details about a real estate transaction that closely track the allegations Jin made in her online posts.  Additionally, in opposition to the motion to strike, Shang offered into evidence declarations from two of Shang's associates who stated that they received calls from Lee's phone number, in which the caller complained that Shang was " 'unprofessional' " and that he was "collecting proof of [Shang's] dishonesty and unprofessionalism."  Although not alleged as part of Shang's defamation cause of action, the evidence that Lee placed calls to Shang's associates is further proof of a nexus between Lee and Jin, and of Lee's involvement in the negative reviews.  Based on this evidence, a trier of fact could reasonably infer that Lee posted the review that Shang attributed to him.  Moreover, the post is susceptible of a defamatory interpretation

18

for the same reason Jin's posts are—it both accuses plaintiff of taking advantage of non-English speaking clients and suggests that he relies on false signatures as a means of taking advantage, facts that Shang disputed in the evidence he introduced in opposition to the motion to strike.

## DISPOSITION

The order denying defendants' special motion to strike is affirmed.  Plaintiff shall recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

HEIDEL, J.*

We concur:

EDMON, P. J.

LAVIN, J.

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19