[No. B192017. Second Dist., Div. Six. Nov. 28, 2007.]

MIDLAND PACIFIC BUILDING CORPORATION, Plaintiff and
Respondent, v.
JOHN E. KING et al., Defendants and Appellants.

## COUNSEL

Manatt, Phelps & Phillips, Michael M. Berger, Lara M. Krieger; and William S. Walter for Defendants and Appellants.

Adamski Moroski Madden & Green, Thomas D. Green, Raymond A. Biering; Brown, Winfield & Canzoneri and Thomas F. Winfield III for Plaintiff and Respondent.

## OPINION

**GILBERT, P. J.**—"The paradigm SLAPP is a suit filed by a large land developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the

developers' plans. [Citations.]" (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815 [33 Cal.Rptr.2d 446], disapproved on another ground by *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 [124 Cal.Rptr.2d 507, 52 P.3d 685].)[1] Paradigms change. Here we conclude plaintiff developer brought its lawsuit to vindicate "a legally cognizable right," not "to obtain an *economic* advantage" over defendants. (*Wilcox, supra,* at p. 816.)

Plaintiff's action is for breach of contract and fraud. Defendants file an anti-SLAPP motion. (Code Civ. Proc., § 425.16.)[2] They claim the lawsuit arises from the exercise of their constitutional rights of free speech and petition in processing a tract map. The trial court denies the motion.

We conclude the cause of action for breach of a contract that requires a party to appear at a public hearing arises from protected activity. But here, plaintiff demonstrates a probability of prevailing.

We also conclude the cause of action for fraud is incidental to the exercise of free speech and petition; therefore it does not arise from protected activity. We affirm.

FACTS

*Contract*

John E. and Carole D. King own 27 acres in San Luis Obispo County. The property is within the City of San Luis Obispo's (City) sphere of influence, and is subject to a specific plan adopted by the City.

In February of 2003, the Kings entered into a written contract to sell their property to Midland Pacific Building Corporation (Midland). Midland agreed to pay $125,000 for each "market rate lot." "Market rate lot" is defined in the contract as a single-family residential lot that is (a) in substantial conformance with the draft specific plan and the draft vesting tentative tract map dated May 2001; (b) approved by the City as part of a vesting tentative tract map; and (c) not subject to requirements, restrictions or limitations related to affordable housing. The parties estimated that there would be 120 market rate lots, but acknowledged that the actual number may be more or less.

The Kings agreed to obtain approval of a specific plan and vesting tentative tract map in substantial conformance with the draft specific plan and draft tentative tract map at their expense.

---

[1] SLAPP stands for "strategic lawsuit against public participation."

[2] All statutory references are to the Code of Civil Procedure unless otherwise stated.

As part of the purchase price, Midland agreed on execution of the contract to lend the Kings $1 million secured by the property, and to pay the Kings $15,000 per month to be applied to existing loans secured by the property until close of escrow.

Escrow would close when the Kings obtained all entitlements and approvals necessary for the construction of a subdivision in substantial conformance with the draft specific plan and draft vesting tentative tract map.

*Complaint*

All did not go as planned. Midland filed this action against the Kings in February of 2006. Midland's first amended complaint alleges as follows:

In 2005, the Kings told Midland that the City demanded a reconfiguration of the tentative map to accommodate additional affordable housing. The reconfiguration would increase the number of detached single-family residential lots to approximately 140. Midland agreed that the reconfiguration would be in substantial conformance with the draft tract map referred to in the contract. The reconfigured map is referred to as the "Amended Draft Tract Map."

In January of 2006, the Kings spoke with Midland's vice-president, Reed Harris. John King told Harris that the cost to obtain subdivision map approval was more than he had anticipated.[3] In addition, the value of the property had increased since the contract was signed. King told Harris that Midland should agree to an increase of $35,000 per lot. If Midland did not agree, King threatened to withdraw the Amended Draft Tract Map, which Midland had approved, and submit a new map to the City. The new map would dramatically increase the density of the project and substantially decrease the size of many lots. A few days later, King repeated this to Midland's president, Dennis Moresco.

On January 23, 2006, Midland's counsel wrote to the Kings rejecting the plan, and insisting that the Kings perform as provided in the contract.

On January 25, 2006, the City's planning commission considered the tentative map for the property. The map before the commission was the 140-lot Amended Draft Tract Map approved by Midland. City staff recommended approval of that map. But for the first time, the Kings presented a new tentative tract map at the hearing. The new map showed 80 lots around

---

[3] All further references to King shall refer to John King, unless clarity demands that we draw a distinction.

the perimeter of the Kings' property, but no lots in the interior. The Kings told the commission they planned to return later and seek approval of a much higher density development in the interior. The complaint refers to the new map as the "High Density Tract Map."

At the same hearing, the planning commission considered tentative subdivision maps for two properties adjacent to the Kings' property. By agreement between the City and the three applicants, the tentative maps for the three properties were being processed concurrently. The residential density of the maps for the adjacent properties is consistent with the density shown on the Amended Draft Tract Map. The commission approved the maps for the adjacent properties with no change in density.

On March 7, 2006, the city council considered the subdivision application for the Kings' property. It voted to have the High Density Tract Map returned to the planning commission for further review. At the hearing, the Kings' representative said the Kings would submit a new map that will include approximately 190 lots. Such a map will not substantially comply with the 140-lot Amended Draft Tract Map approved by Midland.

Midland alleges the Kings breached the contract by processing the High Density Tract Map instead of the 140-lot map. Midland also alleges the Kings misrepresented to Midland the City would not approve the 120-lot map. Therefore Midland's consent to the 140-lot map was obtained through fraud.

*Anti-SLAPP Motion*

The Kings responded to the complaint by filing an anti-SLAPP motion. In support of the motion, they submitted an affidavit by David Watson, the Kings' director of planning and project development. Watson declared the Kings' project had to be changed in order to be consistent with the City's recently enacted housing element and the specific plan for the area. The adopted specific plan is different from the draft plan. It requires higher densities, multiple housing types, affordable housing, areawide drainage improvements, and other major infrastructure improvements to be constructed at the owner's expense. In response to the City's concerns, the Kings presented a revised map and plan to advance the City's " 'affordable-by-design' " housing element goals. The revised map was unanimously endorsed by the planning commission, and the city council unanimously supported the revised design.

Midland submitted the declaration of Reed Harris, its vice-president, in opposition to the motion. Harris declared that until January 17, 2006, the Kings advised him they were processing a map for 140 lots. On January 17,

2006, Harris heard a rumor that the Kings were going to submit a map having a substantially higher density. The next day, Harris called the City's deputy development director, Michael Draze. Draze told Harris the City was not requiring increased density, but if the developer volunteered, the City would consider it.

Harris further declared that he spoke to John King on January 18, after speaking with Draze. Harris asked King whether he was increasing the project density. King responded that the project had taken longer and cost more than he had anticipated and that the land had significantly increased in value. King said "he felt" Midland should increase the purchase price by $35,000 per lot. King said he would have to do something unless he talked to Midland's president, Dennis Moresco, soon.

Harris declared that he attended the planning commission meeting on January 25, 2006. The commission agenda showed the 140-lot Amended Draft Tract Map would be considered. The staff report recommended approval of that map. At the meeting, the Kings showed the commission the new High Density Tract Map. The commission approved the new map. Harris had never seen the map before the hearing.

Moresco, Midland's president, declared: Midland loaned the Kings $1 million and made $15,000 monthly payments as required by the contract. Shortly before the planning commission meeting, Moresco received a telephone call from John King. King told him that unless he agreed to pay an additional $4 million, he would submit a high-density map to the City. Moresco refused to pay King more. Moresco had never seen the High Density Tract Map prior to the planning commission hearing.

Watson, the Kings' director of planning, declared in rebuttal that Harris attended meetings with the City, and knew the City was refusing to process maps that did not meet minimum standards for density. John King declared he asked that Midland "recognize" his project costs had increased by $5 million, but made no threat or demand for any payment as a condition for processing the project.

## DISCUSSION

### SLAPP

Section 425.16 establishes a procedure for bringing a special motion to strike lawsuits that are brought primarily to "chill" the valid exercise of the constitutional rights of freedom of speech and petition for the redress of

grievances. (*Id.*, subd. (a); *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 197 [46 Cal.Rptr.3d 41, 138 P.3d 193].)

Section 425.16, subdivision (b)(1), provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

An " 'act in furtherance of a person's right of petition or free speech . . .' " includes any written or oral statement made before a legislative, executive, or judicial body, or any other official proceeding authorized by law, or in connection with an issue under consideration by such body or in such proceeding. (§ 425.16, subd. (e)(1), (2).) The moving party need not separately demonstrate that such an oral or written statement concerns an issue of public significance. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123 [81 Cal.Rptr.2d 471, 969 P.2d 564].)

Section 425.16 requires the trial court to undertake a two-step process. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906 [120 Cal.Rptr.2d 576] (*Kashian*).) First, the court must decide whether the defendant has made a prima facie showing that the acts of which the plaintiff complains were taken in furtherance of the defendant's rights of petition or free speech. (*Ibid.*) If the defendant carries that burden, the burden shifts to the plaintiff to show a probability of prevailing on the claim. (*Ibid.*) The plaintiff can carry his burden by making a prima facie showing of facts that would, if proved, support a judgment in his favor. (*Ibid.*) The court's consideration of the defendant's evidence is limited to determining whether it defeats the plaintiff's showing as a matter of law. (*Ibid.*) The trial court does not weigh the evidence or make credibility determinations. (*Ibid.*)

Finally, both steps of the process are subject to our independent review on appeal. (*Kashian, supra*, 98 Cal.App.4th at p. 906.)

### BREACH OF CONTRACT

The Kings contend they have carried their burden of a prima facie showing that the acts of which Midland complains were taken in furtherance of their rights of petition and free speech.

The Kings argue it is undisputed the action arose from their presentation of the High Density Tract Map to the City. The Kings conclude their acts are within section 425.16, subdivision (e)(1) and (2), statements made before a

legislative body or in an official proceeding, or made in connection with an issue under consideration by such body or in such proceeding.

The trial court determined the statute was not intended to protect purely business transactions. The court concluded that because the complaint arises out of an alleged breach of contract, the Kings have not succeeded in showing the action arises from protected activity.

The trial court relied on *Ericsson GE Mobile Communications, Inc. v. C.S.I. Telecommunications Engineers* (1996) 49 Cal.App.4th 1591 [57 Cal.Rptr.2d 491] (*Ericsson*). There, in determining the anti-SLAPP statute does not apply to a cause of action for intentional interference with economic advantage, the court stated: "[I]n determining whether a cause of action falls within the scope of the statute, we hold that the Legislature intended to include only those suits that are based upon acts that are primarily in furtherance of a person's constitutional right of free speech, i.e., acts which advance or promote that right. For it is only in those cases where the party acted for the purpose of promoting or advancing his or her right of free speech, in contrast to one where the parties are performing or breaching their contractual obligations, that the right could be chilled by the specter of an unfounded lawsuit." (*Id.* at p. 1601.)

But our Supreme Court disapproved *Ericsson* in *Navellier v. Sletten* (2002) 29 Cal.4th 82 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*). The court stated nothing in the anti-SLAPP statute categorically excludes any particular type of action from its operation. (*Id.* at p. 92.) Conduct alleged to constitute a breach of contract may also come within constitutionally protected speech or petitioning. (*Ibid.*) The focus of the statute is not the form of the plaintiff's cause of action, but the defendant's activity that gives rise to the asserted liability. (*Ibid.*)

*Navellier* also makes clear, however, that the anti-SLAPP statute does not bar a plaintiff from litigating an action for breach of contract or fraud that arises from the defendant's free speech or petitioning. (*Navellier, supra,* 29 Cal.4th at p. 93.) Where a complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the plaintiff's evidence is credited, it is not subject to being stricken under the anti-SLAPP statute. (*Ibid.*)

Midland's cause of action for breach of contract is based on the Kings' submission of the High Density Tract Map to the planning commission and city council. These acts were in the course of an official proceeding and were clearly in furtherance of the Kings' right of petition and free speech.

Midland's reliance on *Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790 [63 Cal.Rptr.3d 575] (*Wang*), is misplaced. There the

Wangs entered into a contract to sell two parcels of land to Wal-Mart. The Wangs retained adjacent parcels for future development. The Wal-Mart parcels were bisected by a street that provided access to the Wangs' retained parcels. The Wangs understood the street would be relocated to accommodate Wal-Mart's development. Instead of relocating the street, however, Wal-Mart obtained a city resolution vacating the street and replacing it with an emergency vehicle easement and truck alley. The Wangs alleged the change was without their knowledge or consent. When the Wangs visited the site after completion of construction, they discovered that access to their retained parcels had been impaired.

The Wangs sued for breach of contract and fraud. Wal-Mart filed an anti-SLAPP motion contending the allegations of the complaint arose from their protected petitioning activity in obtaining development permits from the city. The trial court determined the complaint arose from protected activity and granted the motion.

■ The Court of Appeal reversed. The court reasoned that the anti-SLAPP statute does not apply where the protected activity is merely incidental or collateral to the unprotected activity alleged in the complaint. (*Wang, supra*, 153 Cal.App.4th at p. 802.) The court concluded that the "overall thrust" of the complaint challenges the manner in which Wal-Mart dealt with the Wangs. (*Id.* at p. 809.) Wal-Mart's pursuit of governmental approvals was collateral to those private dealings. (*Ibid.*)

■ Indeed, modern real estate development almost always requires governmental permits. The anti-SLAPP statute will not protect a developer from a complaint for breach of contract simply because the developer sought governmental permits for the activity that constitutes the breach. The purpose of the contract in *Wang* was to allow Wal-Mart to develop its property. Governmental approval was simply collateral to that purpose.

Here, in contrast, obtaining governmental approval was not collateral to the contract, it was of the essence of the contract. It was what Midland paid the Kings to do. Conduct alleged to constitute breach of contract may also come within constitutionally protected speech or petitioning. (*Navellier, supra*, 29 Cal.4th at p. 92.) Here the actions that allegedly breached the contract necessarily and essentially constitute petitioning activity; that is activity protected under the anti-SLAPP statute.

Nor does *Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154 [64 Cal.Rptr.3d 488], aid Midland. There a landlord filed notice under the Ellis Act (Gov. Code, § 7060 et seq.) that it intended to permanently remove units from the rental market. The Ellis Act allows landlords who comply with its

provisions to go out of the rental business even if doing so would otherwise violate a local rent control ordinance. Tenants of the units subject to the notice sued challenging the landlord's right to invoke the Ellis Act. The landlord responded with an anti-SLAPP motion, contending the tenants' suit arose from filing and serving Ellis Act notices. The Court of Appeal determined the landlord failed to show the lawsuit arose from any act in furtherance of its right of petition or free speech. The Court reasoned that simply because the lawsuit was filed after the Ellis Act notices does not mean it arose from or is based on the filing of the notices. (*Marlin, supra,* at p. 160.)

Here it is clear Midland's breach of contract cause of action arose from petitioning activity. It arose directly out of statements made and plans submitted to the planning commission and city council.

The Kings have shown that Midland's breach of contract cause of action satisfies the first prong of the anti-SLAPP test. That shifts the burden to Midland to make a prima facie showing of a probability of prevailing on the complaint. (*Kashian, supra,* 98 Cal.App.4th at p. 906.)

The trial court's ruling was based on the theory that the Kings failed to carry their burden of showing the complaint arose from an act in furtherance of their rights. It may have also considered Midland's probability of prevailing. Nevertheless, whether Midland has made a prima facie showing of merit is a question of law over which we exercise our independent judgment. (*Kashian, supra,* 98 Cal.App.4th at p. 906.)

The Kings contracted to and received substantial payment for using their best efforts to obtain the City's approval of a low-density tract map. The Kings argue that there is no evidence they did not use their best efforts. But the evidence shows the Kings sought and obtained preliminary approval for the High Density Tract Map. That alone is sufficient evidence of a breach. One does not use one's best efforts to obtain approval of a low-density tract map by promoting a competing high-density map.

The Kings argue they simply presented an alternative to the City. But the Kings did not contract to and were not being paid to present an alternative map. A reasonable trier of fact could conclude the presentation of an alternative map breached the Kings' duty to use their best efforts to obtain approval of the original map.

The Kings argue the City's uncertain regulatory climate "clouded" the processing of the reconfigured 140-lot map. But the Kings cite no authority for the proposition that a clouded regulatory environment relieves them of their

obligations under the contract. Moreover, there is evidence that the City's staff recommended approval of the low-density map for the Kings' property, and that the City approved low-density maps for two adjacent subdivisions. A reasonable trier of fact could conclude that the Kings sought to avoid their obligations to Midland's contract under the guise of concern over the regulatory environment.

■ The Kings argue there is no evidence of damages. But the Kings cite no authority for the proposition that damages is an element of a cause of action for breach of contract. In fact, in the absence of a showing of actual damages, nominal damages are available. (Civ. Code, § 3360; *Sweet v. Johnson* (1959) 169 Cal.App.2d 630, 632 [337 P.2d 499].) Midland has shown a prima facie case for breach of contract. That is what is necessary for Midland to prevail. (*Kashian, supra*, 98 Cal.App.4th at p. 906.) The Kings' evidence does not defeat Midland's showing as a matter of law. (*Ibid.*)

## *FRAUD*

The cause of action for fraud requires a different analysis than the causes of action based on breach of contract.

Midland's cause of action for fraud alleges Midland's approval of the 140-lot map, instead of the original 120-lot map, was obtained by the Kings' agent's representation that the increase in the number of lots was necessary to obtain the City's approval. The Kings knew the representation was false. The 140-lot map was the result of an agreement by King with the owners of adjacent properties to shift some affordable housing requirements to the Kings' property. The Kings received compensation for the agreement.

The Kings denied the alleged representation was false. They also denied that they had any agreement with adjacent property owners. But the Kings did not deny that they made the representation that 140-lot map was necessary to obtain the City's approval.

The critical question in an anti-SLAPP motion "is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." (*Navallier, supra*, 29 Cal.4th at p. 89; see *Marlin v. Aimco Venezia LLC, supra*, 154 Cal.App.4th at p. 160.) Here the representation that forms the basis of the fraud cause of action was made between private parties to induce one of the parties to consent to a change in the terms of a contract. That representation has nothing to do with the exercise of the Kings' right to free speech and partition. Thus the fraud cause of action is not based on any protected activity. As the Kings' later actions demonstrated, Midland's consent or lack of it was irrelevant to the exercise of the Kings' rights to present

whatever map they wanted to the City. In their fraud cause of action, the Kings have failed to pass the first step of the anti-SLAPP motion process. Therefore, Midland need not show a probability it will prevail on its fraud claim.

█ Finally, the Kings argue for the first time in their petition for rehearing that the trial court erred in ruling on their evidentiary objections. It is much too late to raise an issue for the first time in a petition for rehearing. (*City of Saratoga v. Huff* (1972) 24 Cal.App.3d 978, 1006 [101 Cal.Rptr. 32].)

The judgment (order) is affirmed. Costs are awarded to respondent.

Yegan, J., and Coffee, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 12, 2008, S159710. Moreno, J., did not participate therein.