Filed 4/2/25  AEG Presents Productions v. Danny Wimmer Presents CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| AEG PRESENTS PRODUCTIONS, LLC,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANNY WIMMER PRESENTS, LLC,<br><br>    Defendant and Appellant. | B323800<br><br>(Los Angeles County<br>Super. Ct. No. 18STCV06655) |

APPEAL from an order of the Superior Court of Los Angeles County.  Robert B. Broadbelt, Judge.  Affirmed.

Wolf, Rifkin, Shapiro, Schulman & Rabkin, Matthew Oster, and Johnny White for Defendant and Appellant.

Pillsbury Winthrop Shaw Pittman, Kathy A. Jorrie, and Jeffrey D. Wexler for Plaintiff and Respondent.

————————————————

The current dispute is between plaintiff and respondent AEG Live Productions, LLC (AEG) and appellant and defendant Danny Wimmer Presents, LLC (DWP), who were copromotors of two large annual music festivals—"Rock on the Range" and "Carolina Rebellion." AEG sued DWP after their relationship broke down, and DWP began promoting its own festivals—"Sonic Temple Art + Music Festival" (Sonic Temple) and "Epicenter Festival" (Epicenter)—as replacements for Rock on the Range and Carolina Rebellion. AEG alleged DWP was its partner in the production and promotion of Rock on the Range and Carolina Rebellion, and that DWP harmed AEG and the partnership when DWP used partnership assets without AEG's consent to create and promote the new festivals.

DWP filed a special motion to strike under Code of Civil Procedure section 425.16 (the anti-SLAPP statute),[1] targeting the allegations that DWP utilized computer-aided design (CAD) drawings created for Rock on the Range and Carolina Rebellion to secure permits for Sonic Temple and Epicenter, and disclosed confidential information regarding the festivals to government entities in direct violation of confidentiality obligations in the parties' copromotion agreements. The trial court denied the motion, finding, although some of AEG's claims arose from protected activity, AEG had shown a probability of prevailing on the merits.

We now affirm.

---

[1] All further undesignated statutory references are to the Code of Civil Procedure. "SLAPP" stands for "strategic lawsuits against public participation." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 139.)

**FACTUAL AND PROCEDURAL BACKGROUND**

I.  **AEG's allegations**

The following allegations are taken from AEG's first amended and supplemental complaint.

In 2007 and 2011, respectively, AEG and Right Arm Entertainment, LLC (Right Arm Entertainment), DWP's predecessor, coproduced the Rock on the Range and Carolina Rebellion music festivals. Danny Wimmer is DWP's chairman and was originally affiliated with Right Arm Entertainment.

Rock on the Range started as a one-day festival in Columbus, Ohio, selling a total of 35,000 tickets. The festival grew each year and was held on the same weekend at the same venue for 12 consecutive years. By 2018, Rock on the Range was a three-day festival with 140,000 attendees.

Carolina Rebellion started as a one-day music festival in Charlotte, North Carolina, selling approximately 31,000 tickets. The festival was later moved to Rockingham, North Carolina, in 2012, and then moved to the Charlotte Motor Speedway in Concord, North Carolina, starting in 2013 and occurring on the same weekend each year thereafter through 2018. By 2018, Carolina Rebellion had grown to a three-day festival, selling 81,000 tickets.

DWP succeeded to Right Arm Entertainment's right, title, and interest in both Rock on the Range and Carolina Rebellion in 2013 or 2014. In 2014, AEG entered into copromotion agreements with DWP for both festivals, and for each year thereafter through 2017. AEG and DWP operated without copromotion agreements in the production of the 2018 Rock on the Range and Carolina Rebellion.

The copromotion agreements provided that the intellectual property associated with the festivals would be jointly owned by the parties. They further provided that neither party may license, sell its rights or otherwise exploit any rights to the intellectual property without the consent of the other party. The parties also had to agree on all media, broadcast, distribution and other exploitation arrangements.

The copromotion agreements also contained confidentiality provisions, which prohibited the parties from sharing any confidential information defined broadly as "confidential and proprietary information" related to the festivals.

In August 2018, DWP notified AEG it no longer wanted to copromote Rock on the Range or Carolina Rebellion, and offered to buy out AEG's interest in the festivals "for a purchase price of three times EBITDA [earnings before interest, taxes, depreciation, and amortization]." AEG asked if DWP would purchase AEG's interest for the same price, and DWP refused. DWP then encouraged AEG to make a counteroffer to purchase DWP's interest. AEG did so, and gave DWP the option of buying out AEG's interest or allowing AEG to purchase DWP's interest "at a purchase price of five times EBITDA." DWP rejected that offer, asserting that " '[t]he valuation basis used in [AEG's proposal] assumes that what is for sale is a going concern' but 'the only "asset" that is jointly owned by the parties is the name of the festivals.' " DWP took the position that "it was free to independently produce and promote festivals, subject only to the obligation to not exploit the intellectual property of Rock on the Range and Carolina Rebellion." DWP then offered AEG "a fee to license the names Rock on the Range and Carolina Rebellion at a set price per year—prices that equaled about 5 [percent] of the

[p]artnerships' profits in each festival in 2018."  AEG rejected the licensing fee offer.

In September 2018, DWP announced that it was replacing Rock on the Range with Sonic Temple.  Sonic Temple was scheduled to take place on the same weekend and at the same location where Rock on the Range had been held each year since 2007.  The press release stated:  "This announcement of the inaugural Sonic Temple Art + Music Festival replaces long-standing festival Rock on the Range."  During a radio interview, Wimmer stated, " 'Everything is staying the same.  It's a simple name change.  It's just going to be bigger and better.  It's at the same stadium.  It's in the same city.  It's going to be Rock and Roll.' "  In a November 2018 press release, DWP reiterated that " "[t]he inaugural [Sonic Temple] replaces the long-standing Rock [o]n the Range, America's largest and most acclaimed rock festival, which routinely sold out over its 12-year span.' "

Also in September 2018, the Carolina Rebellion Fan Zone Facebook group announced in a post that DWP would be replacing Carolina Rebellion with a smaller, " 'European Styled,' yet-to-be-named, new festival with a location change to Rockingham, North Carolina."  "Representatives from the Facebook group reported that DWP had asked fans for suggestions and concerns to ensure the festival formerly known as Carolina Rebellion would provide the best festival experience under its new name."  In November 2018, "DWP officially announced that its 'replacement' festival for Carolina Rebellion would be styled 'Epicenter Festival,' that such festival would be held at the Rockingham Motor Speedway," the prior venue of Carolina Rebellion.

Sonic Temple was held on May 17, 18, and 19, 2019, at the same venue as the prior Rock on the Range. Epicenter was held on May 11 and 12, 2019 at the Rockingham Festival Grounds—the location of a prior Carolina Rebellion. AEG alleged that Epicenter and Sonic Temple, respectively, shared numerous experiences and other attributes of Carolina Rebellion and Rock on the Range, including the layout, experiences, marketing campaign, social media sites, imagery, sponsors, exhibitors, vendors, publicist, media outlets, talent, location, and dates.

AEG's complaint alleged 27 causes of action for breach of fiduciary duty; fraudulent misrepresentation; fraudulent concealment; intentional interference with contract; intentional interference with prospective economic advantage; breach of contract; accounting, unfair competition, trademark infringement; and conversion.

## II.    DWP's special motion to strike

DWP filed a special motion to strike under the anti-SLAPP statute, asserting AEG's claims arose from acts in furtherance of DWP's right of petition or free speech under the United States Constitution or the California Constitution; and AEG could not establish a probability of prevailing on those claims.

DWP's motion selectively targeted specific words in the complaint's general allegations, as well as from those allegations in support of AEG's causes of action for breach of fiduciary duty and breach of contract. DWP sought to strike the following words.

It moved to strike the words "government entities" from AEG's allegation that DWP utilized the names and intellectual property of Rock on the Range and Carolina Rebellion without AEG's consent by disclosing confidential information to

6

"[d]estination [a]nalysts, *government entities*, sponsors, vendors, venues, and other third parties."

DWP sought to strike the words "utilizing partnership assets for its sole gain" from AEG's allegation that DWP breached its fiduciary duties "by appropriating partnership opportunities and *utilizing partnership assets for its sole gain*." It also sought to strike the words "CAD drawings without AEG's consent" and "disclosing to third parties confidential information provided or produced in connection with Rock on the Range without AEG's consent" from AEG's allegation that, DWP breached the Rock on the Range and Carolina Rebellion copromotion agreements "by using . . . *CAD drawings without AEG's consent* [and] *by disclosing to third parties confidential information provided or produced or produced in connection with Rock on the Range without AEG's consent*."

DWP moved to strike the entire paragraph, which alleged: "DWP utilized the CAD drawings for Rock on the Range and, on information and belief, the CAD drawings for Carolina Rebellion, in the production of, and to secure permits for Sonic Temple and Epicenter Festival, respectively."

Although the allegations targeted by DWP varied, DWP explained that its motion was directed at AEG's claims that DWP was "liable in contract and tort for privileged acts of pursuing permits from governmental entities to stage its 2019 festivals," specifically, the allegations "that DWP divulged confidential information to government entities by presenting 'CAD drawings,' " during the permitting process. DWP characterized AEG's complaint as "a quintessential SLAPP: an 800-pound gorilla within an industry suing a smaller competitor for participating lawfully in local permitting proceedings."

7

AEG opposed the motion on various grounds. It argued the challenged claims were subject to the commercial speech exemption of the anti-SLAPP statute codified in section 425.17. It further argued, even if the commercial speech exemption did not apply, the claims did not arise from protected activity. To the extent the claims did arise from protected activity, AEG argued it had shown a probability of prevailing on the merits.

The trial court denied the motion. It found the commercial speech exemption did not apply and that the challenged claims implicated protected activity in that they involved DWP's submission of confidential material to government entities in the permitting process. However, it found AEG met its burden to show a probability of prevailing on the merits of its claims.

DWP appealed.

## DISCUSSION

### I. Standard of review and applicable law

"We review a trial court's ruling on a special motion to strike pursuant to section 425.16 under the de novo standard. [Citations.] 'In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly granted.' " (*Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1002 (*Trinity*).)

"As always, 'our job is to review the trial court's ruling, not its reasoning.' [Citation.] We consider 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' [Citation.] In considering the pleadings and declarations, we do not make credibility determinations or compare the weight of the evidence; instead, we accept the opposing party's evidence as true and evaluate the

8

moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law." (*Trinity*, *supra*, 59 Cal.App.5th at pp. 1002–1003.)

"The Legislature enacted section 425.16 to prevent and deter 'lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' " (*Trinity*, *supra*, 59 Cal.App.5th at p. 1003, quoting § 425.16, subd. (a).) "Thus, the purpose of the anti-SLAPP law is 'not [to] insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity.' " (*Trinity*, at p. 1003, quoting *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)

"When a party moves to strike a cause of action (or portion thereof) under the anti-SLAPP law, a trial court evaluates the special motion to strike by implementing a two-prong test: (1) has the moving party 'made a threshold showing that the challenged cause of action arises from protected activity' [citation]; and, if it has, (2) has the nonmoving party demonstrated that the challenged cause of action has ' "minimal merit" ' by making 'a prima facie factual showing sufficient to sustain' a judgment in its favor? [Citations.] Thus, after the first prong is satisfied by the moving party, 'the burden [then] shifts to the [nonmoving party] to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated.' " (*Trinity*, *supra*, 59 Cal.App.5th at pp. 1003–1004.)

## II. The allegations targeted by DWP do not constitute protected activity for purposes of the anti-SLAPP statute

In determining whether AEG's claims arise from protected activity, "the critical consideration is whether the cause of action is *based* on the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) At this stage, we " 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' " (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).) DWP bears the burden "to identify what acts each challenged claim rests on and to show how those acts are protected under a statutorily defined category of protected activity." (*Ibid.*)

When a plaintiff pleads " ' "mixed causes of action," ' " i.e., "a cause of action that rests on allegations of multiple acts, some of which constitute protected activity and some of which do not," the defendant "must identify the acts alleged in the complaint that it asserts are protected and what claims for relief are predicated on them." (*Bonni, supra*, 11 Cal.5th at p. 1010.) In turn, we "examine whether those acts are protected and supply the basis for any claims." (*Ibid.*) "It does not matter that other unprotected acts may also have been alleged within what has been labeled a single cause of action; these are 'disregarded at this stage.' " (*Ibid.*)

With this claim-by-claim approach in mind, we are mindful that "[a]ssertions that are 'merely incidental' or 'collateral' are not subject to section 425.16." (*Baral, supra*, 1 Cal.5th at p. 394.) That is, "[a]llegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be

10

stricken under the anti-SLAPP statute." (*Ibid.*)  "[A] claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 (*Park*).)  The anti-SLAPP statute does not "swallow a person's every contact with government." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 630.)

DWP does not address its first-step burden in its opening brief; instead, choosing to focus entirely on the second step— whether AEG could show a probability of success on the merits. However, in its responding brief, AEG argues DWP failed to meet its initial burden to show the allegations did not arise from protected activity.  Specifically, AEG argues "the injury-producing conduct was DWP's taking of the partnerships' festival business for itself," and that DWP's use of the CAD drawings to secure the permits were the means that allowed DWP to take the good will of the partnerships' business.  Essentially, AEG argues that, to the extent its complaint implicated protected activity, that activity is merely incidental or collateral to the unprotected activity and thus not subject to the anti-SLAPP statute. We agree with AEG.

The case *Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790 (*Wang*) is instructive.  There, the Wangs entered into a contract to sell two parcels of land to Wal-Mart.  (*Id.* at p. 795.)  The Wal-Mart parcels were cut in half by a parkway, which provided access to two additional parcels that the Wangs retained for future development.  (*Ibid.*)  While the parties understood that the parkway would have to be vacated, the Wangs believed the parkway would be replaced by a

11

new street that would allow access to their remaining parcels. (*Ibid*.)  During the development process, a city planner expressed concerns about some traffic aspects of Wal-Mart's development application, stating his belief that the current plan was unfeasible.  (*Id*. at p. 796.)  In response, Wal-Mart notified the city planner that instead of relocating the parkway, they would dedicate an easement for emergency vehicle access that Wal-Mart would also use as a truck alley for access to a truck dock.  (*Id*. at p. 797.)  The Wangs alleged they received no notice from Wal-Mart or the city that instead of creating a street to replace the parkway, Wal-Mart would be providing an easement for emergency vehicle access and a truck alley.  (*Ibid*.)  The Wangs only found out about the change to the plan when they visited the site after construction was completed.  (*Ibid*.)  They found no street had been constructed to lead to their remaining properties, which were now fronted onto a dead end or cul-de-sac, impairing the value of their properties.  (*Ibid*.)

The Wangs sued Wal-Mart for breach of contract and fraud. (*Wang, supra*, 153 Cal.App.4th at pp. 797–798.)  Wal-Mart filed an anti-SLAPP motion contending the allegations of the complaint arose from their protected petitioning activity in obtaining development permits from the city.  (*Id*. at p. 798.) The trial court granted the motion, finding the claims arose from protected activity and that the Wangs had not demonstrated a probability of success on the merits.  (*Id*. at p. 799.)

The Court of Appeal reversed, finding Wal-Mart had not met its burden to show the Wangs' claims arose from protected activity.  It found Wal-Mart's petitioning activity was only collateral or incidental to the Wangs' claims for relief under the anti-SLAPP statute.  (*Wang, supra*, 153 Cal.App.4th at p. 809.)

12

"The overall thrust of the complaint challenges the manner in which the parties privately dealt with one another, on both contractual and tort theories, and does not principally challenge the collateral activity of pursuing governmental approvals." (*Ibid*.)  With respect to the communications Wal-Mart had with the city planning entities, the court found Wal-Mart's improper conduct did not arise from the petitioning activities in pursuing the permits, but rather from its conduct in carrying out its contractual duties.  (*Id*. at p. 808.)  The court found the situation analogous to a defendant developing a product, and in the process, committed unprotected tortious acts or breaches of contract.  "The liability theory is the loss of property value, allegedly caused by breach of contract or fraud (or inverse condemnation), rather than damages caused by any protected activity involving speech or petitioning the government."  (*Id*. at p. 809.)

Here, the overall thrust of AEG's complaint is that DWP harmed AEG by cutting AEG out of promoting and producing Rock on the Range and Carolina Rebellion, rebranding those festivals, and using partnership assets without AEG's consent to produce the new festivals for DWP's sole gain.  The fact that DWP had to secure permits to produce the new festivals was incidental and collateral to the main objective—the production of the new festivals themselves.  (See *Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 273 [recognizing the anti-SLAPP statute will not protect a developer from a complaint for breach of contract simply because the developer sought governmental permits for the activity that constitutes the breach].)

13

In its reply brief, DWP asserts that, even if AEG can reframe the nature of the injury-producing conduct as DWP's taking of the partnerships' festival business, DWP's anti-SLAPP motion was directed towards specific allegations, which characterized the protected activity; here, using the CAD drawings to secure the permits, as the wrongdoing itself. Thus, DWP argues, because AEG alleges the protected activity was the wrongful conduct, it cannot be incidental or collateral to AEG's claims.

While we agree with DWP that a claim-by-claim analysis is required under our Supreme Court's authority (see, e.g., *Baral*, *supra*, 1 Cal.5th 376; *Park*, *supra*, 2 Cal.5th 1057; *Bonni*, *supra*, 11 Cal.5th 995), that does not change our opinion that the petitioning activity here was collateral or merely incidental to AEG's allegations of DWP's wrongdoing. This is because AEG is not alleging that DWP engaged in wrongful conduct by securing permits for its new festivals; rather, AEG is alleging that the wrongful conduct was utilizing partnership assets and disclosing confidential information without AEG's consent in violation of the parties' agreements. (See *Wang*, *supra*, 153 Cal.App.4th at p. 794.) Like the defendant in *Wang*, the allegations primarily concern the manner in which the private transactions between the parties were conducted, and the governmental development permit applications were only incidental or collateral to the principal purposes of those transactions. In other words, DWP's alleged breach was not that it secured permits for its new festivals, but the fact that, in doing so, DWP used partnership assets and disclosed confidential information without AEG's consent. The alleged wrongdoing is based on parties' private conduct; here, the copromotion agreements, and DWP's conduct

14

in complying with its contractual duties, not DWP's petitioning activity.

We also find AEG's citation to *Gaynor v. Bulen* (2018) 19 Cal.App.5th 864 (*Gaynor*) instructive. There, the plaintiffs were beneficiaries to a trust and the defendants were the trustees and another beneficiary. The plaintiffs filed a surcharge petition, alleging defendants took numerous actions with respect to the trust to benefit themselves at the expense of the plaintiffs. (*Id*. at p. 869.) These actions included a plan to modify the trust terms to implement new trustee succession rules that would ensure the current trustees continued to have control over distributions. (*Ibid*.) In implementing this plan, the plaintiffs alleged the defendants withdrew trust assets and used those assets to file and defend probate petitions in an attempt to persuade the probate court to adopt their plan. (*Ibid*.) One of the defendants filed a motion to strike under the anti-SLAPP statute, arguing the claims arose from his participation in the probate litigation, and these actions were in furtherance of his right to petition and barred by the litigation privilege. (*Id*. at p. 875.) The trial court denied the motion and the Court of Appeal affirmed. (*Ibid*.)

The *Gaynor* court held the claim that defendants improperly used the trust assets in funding the probate litigation did not constitute protected activity. (*Gaynor*, *supra*, 19 Cal.App.5th at p. 880.) While the court agreed with the defendants that filing petitions, motions, and briefs in court are protected petitioning activities under the anti-SLAPP statute, the plaintiffs' breach of fiduciary claim was not based on the protected activity. (*Ibid*.) Rather, the activity giving rise to the plaintiffs' alleged harm was the breach of loyalty in formulating and pursuing this plan and the improper use of trust assets to

15

wrongfully benefit the defendants. (*Ibid.*) "Although the alleged breach of loyalty may have been carried out by the filing of probate petitions, it was not the petitioning activity itself that is the basis for the breach of fiduciary claim." (*Ibid.*)

Likewise, here, although the alleged breach of fiduciary duty and breach of contract may have been carried out, in part, by using the CAD drawings to secure the permits for the new festivals, securing those permits was not the basis for these claims. Rather, the claims are based on DWP's taking of the partnerships' festival business for itself, by using partnership assets for its sole gain, and making it impossible to sell the Rock on the Range and Carolina Rebellion brands and the brands' goodwill.

Accordingly, we find allegations targeted by DWP's motion to strike were merely incidental or collateral to AEG's claims. Thus, DWP has not met its initial burden to show the targeted allegations arose from protected activity for purposes of the anti-SLAPP statute.[2]

---

[2] Because we conclude DWP did not meet its first-prong burden, we do not consider parties' additional arguments regarding the commercial speech exemption or whether AEG demonstrated its claims had at least minimal merit.

## DISPOSITION

The order is affirmed.  Respondent shall recover its costs on appeal.


VIRAMONTES, J.


WE CONCUR:



GRIMES, Acting P. J.



WILEY, J.